**UNITED STATES of America,**
**Plaintiff-Appellee,**

v.

**Bernard McKEON, Defendant-Appellant.**

**No. 834, Docket 83–1340.**

United States Court of Appeals,
Second Circuit.

Argued Feb. 27, 1984.

Decided June 20, 1984.

Joseph Calluori, New York City (Michael Kennedy, Michael Kennedy, P.C., New York City, on the brief), for defendant-appellant.

Marion J. Bachrach, Asst. U.S. Atty., E.D.N.Y., Brooklyn, N.Y. (Raymond J. Dearie, U.S. Atty., Ronald DePetris, Chief Asst. U.S. Atty., Brooklyn, N.Y., on the brief), for plaintiff-appellee.

Before OAKES, VAN GRAAFEILAND and WINTER, Circuit Judges.

WINTER, Circuit Judge:

Following a trial before Judge Platt and a jury, appellant Bernard McKeon was convicted in the Eastern District of New York on one count of conspiracy to export fire-

arms in violation of 18 U.S.C. § 371. McKeon was acquitted of eight substantive counts concerning the illegal exportation of firearms. The trial was McKeon's third on these charges, the first two having ended in mistrials. At issue on appeal is Judge Platt's admission into evidence at the third trial of portions of the opening statement made by McKeon's lawyer at the second trial and the resulting disqualification of that lawyer.

We affirm.

## BACKGROUND

On October 31, 1979, Irish police in Dublin found firearms in crates sent from New York supposedly containing electric paper drills. The alleged shipper of the crates, "Standard Tools," was a fictitious New York corporation which gave as its address a building in Queens, New York, owned by Bernard McKeon.

Officials of the United States Customs Service investigated the origin of the seized shipment and unearthed several shipping and warehousing documents relating to the shipment signed by one "John Moran." On at least one of these documents, which bore the Standard Tools letterhead, they discovered fingerprints of McKeon and his wife, Olive McKeon. After learning that McKeon owned the building given by Standard Tools as its mailing address, Customs Service agents interviewed him. McKeon told the agents that he had rented space to Standard Tools for use as a mail drop, explaining that this arrangement had been worked out after he had been approached on the street by John Moran or a party claiming to represent John Moran.

McKeon's first trial on federal firearms charges took place in December, 1982 and ended in a mistrial when the jury was unable to reach a verdict. Prior to McKeon's second trial, a government handwriting and photocopy expert concluded that warehousing and shipping documents supposedly prepared by representatives of Standard Tools, were photocopies produced on the xerox machine located in the bank in

which Olive McKeon worked. The defense was apprised both of the expert's identity and his conclusions. In his opening statement at the second trial, Michael Kennedy, McKeon's lawyer [1] told the jury that the evidence would show that McKeon had innocently helped build packing crates for his tenant, John Moran, and that Moran alone was responsible for the Standard Tools' shipment of weapons. Kennedy then declared:

With reference to the place where Olive McKeon works, expert testimony is going to be brought in to show that the Xerox machine ... where Mrs. McKeon worked is not—I repeat—is not the same kind of Xerox machine that prepared any of the Standard Tools Xeroxed documents.

The evidence will also indicate that Mrs. McKeon had absolutely nothing to do with this case other than doing what many wives do, which is, picking up mail and opening it. That is the extent, the sum and substance of her involvement.

The second trial ended in a mistrial before the conclusion of the prosecution's case-in-chief when the defense moved for access to classified documents regarding alleged foreign wiretaps. As a consequence, the expert testimony promised by Kennedy in his opening statement was never offered.

Kennedy's opening statement at the third trial depicted Olive McKeon's role in the events differently than had his opening statement at the second trial. At the third trial, Kennedy told the jury that Bernard McKeon gave his wife the warehouse receipt and some Standard Tools stationery so that she might make two photocopies on the stationery using the bank's xerox machine. This was done, Kennedy said, as a favor to John Moran. He thus continued to picture Bernard McKeon as the innocent dupe of John Moran.

The next day, outside the presence of the jury, the prosecution moved to introduce as evidence the above-quoted portion of Kennedy's opening statement from the second trial. Arguing that the statement was the

---

**1.** Kennedy did not represent McKeon at the first    trial.

admission of a party-opponent under Fed. R.Evid. 801(d)(2), the prosecution suggested that it should be imputed to McKeon for any of the following reasons: (i) it was a statement in which McKeon had "manifested his adoption or belief in its truth," *id.* 801(d)(2)(B); (ii) it was "a statement by a person authorized by [McKeon] to make a statement concerning the subject," *id.* 801(d)(2)(C); and (iii) it was "a statement made by [McKeon's] agent . . . concerning a matter within the scope of his agency," *id.* 801(d)(2)(D). The government argued that the inconsistencies in Kennedy's statements were relevant to prove McKeon's consciousness of guilt under Fed.R.Evid. 404(b). Judge Platt ruled that Kennedy's opening statement at the second trial was admissible as an admission under Rule 801(d)(2).

Judge Platt's ruling precipitated another urgent issue, namely, whether Kennedy could continue as McKeon's trial counsel. N.Y.Jud.Law, Disciplinary Rule 5–102(A) (McKinney 1975) of the Code of Professional Responsibility requires that when "it is obvious that [a lawyer] . . . ought to be called as a witness on behalf of his client, he shall withdraw from the conduct of the trial." The prosecution argued that since Kennedy "ought" to be called as a witness to explain the difference between the two opening statements, he could not continue as trial counsel. To counter this argument, McKeon expressed his willingness (through Kennedy) to waive his right to call Kennedy as a witness. McKeon (again through Kennedy) was unwilling, however, to waive his right to have Kennedy argue the credibility of any witness (including McKeon) regarding testimony concerning conversations between the witness and Kennedy which might have prompted Kennedy to portray events differently at the two trials. Judge Platt believed the proffered waiver insufficient to resolve the Disciplinary Rule 5–102(A) problem since, if Kennedy argued

the credibility of such a witness, he would implicitly be arguing his own credibility as an unsworn witness. As a last resort, Judge Platt offered to hear Kennedy *ex parte* and *in camera* on the reasons for the change in opening statements, but his offer was not accepted.

After ruling that Kennedy could not continue as trial counsel, Judge Platt adjourned the proceedings so that McKeon could obtain independent legal advice. When court reconvened, McKeon indicated his decision to proceed *pro se.* He refused both to take an interlocutory appeal of the disqualification decision or to retain other counsel, asserting that Kennedy was the only lawyer he wished to represent him and that he and his wife could tolerate no further delay in the resolution of the matter. After extensive questioning to determine whether McKeon understood the consequences of his decision, Judge Platt concluded that McKeon's waiver of his right to counsel was valid. The trial then went forward with McKeon conducting his own defense, although Kennedy was free to advise McKeon or make legal arguments outside the presence of the jury.[2]

As part of its case-in-chief, the government introduced the above-quoted portions of Kennedy's opening statement from the second trial. It also put on its expert witness in photocopying, James Kelly, who testified that between the second and third trials he met a former student, Jim Horan, and told him that he, Kelly, had been hired by the prosecution to testify at the third McKeon trial. Horan had been hired as the expert witness for the defense; until his meeting with Kelly, the defense had believed that the prosecution's expert witness would be one Peter Tytell, another former Kelly student. In summation, the prosecution argued that so long as the defense believed that Horan and Tytell would offer conflicting testimony about the xerox machine on which the copies were produced, it

---

**2.** Judge Platt did not permit Kennedy to sit in the courtroom in the presence of the jury because he had already been introduced as McKeon's attorney. It does not appear that

Kennedy accepted Judge Platt's offer to permit him to argue legal points outside the presence of the jury.

was prepared to contend that Olive McKeon did not xerox the warehouse receipt. Once it discovered that the teacher, Kelly, would dispute his pupil, Horan, at the third trial, the defense elected to present a different version of the facts—*viz.* that the receipt had been xeroxed by Olive McKeon at her workplace but for innocent reasons. The prosecution's summation dwelt at length on the change in stories as manifested by the opening statements, arguing that it established McKeon's consciousness of guilt.

This appeal followed McKeon's conviction on a single count of conspiracy.

## DISCUSSION

### 1. *The Admissibility of the Opening Statement*

The parties agree that the evidentiary use against a criminal defendant of his counsel's argument to a jury in an earlier trial is without direct precedent. Although guidance is found in the rules and underlying policies of the law of evidence, the issue raises a number of difficulties since it touches upon numerous sensitive areas including: communications between criminal defendants and their attorneys, the privilege against self-incrimination, fear of impeachment by a prior conviction, the work product, legal theories and trial tactics of the attorney, the freedom of the attorney to engage in uninhibited and robust advocacy, the right to counsel of one's choice, and the usual issues of relevance, confusion and unfair prejudice as well.

We begin with the general proposition that "[s]tatements made by an attorney concerning a matter within his employment may be admissible against the party retaining the attorney," *United States v. Margiotta*, 662 F.2d 131, 142 (2d Cir.1981), *cert. denied,* — U.S. ——, 103 S.Ct. 1891,

77 L.Ed.2d 282 (1983), a proposition which extends to arguments to a jury. The binding effect on a party of a clear and unambiguous admission of fact made by his or her attorney in an opening statement was acknowledged by the Supreme Court in *Oscanyan v. Arms Co.*, 103 U.S. 261, 263, 26 L.Ed. 539 (1880) and has been frequently recognized in subsequent lower court decisions involving civil cases. *See, e.g., Rhoades, Inc. v. United Air Lines*, 340 F.2d 481, 484 (3d Cir.1965); *Collins v. Texas Company*, 267 F.2d 257, 258 (5th Cir. 1959). An admission by a defense attorney in his opening statement in a criminal trial has also been held to eliminate the need for further proof on a given element of an offense, *Dick v. United States*, 40 F.2d 609, 611 (8th Cir.1930) (attorney's opening statement that defendant previously had been convicted of an offense involving sale of liquor sufficient evidence as to that fact).

The general admissibility of an attorney's statements, as well as the binding effect of an opening statement within the four corners of a single trial, are thus well established. The specific issue before us, however, is somewhat different. It involves not the binding effect of an attorney's statements within a trial, but rather the evidentiary use against a criminal defendant of an attorney's seemingly inconsistent statement at an earlier trial to prove that fundamental portions of the defendant's present case are fabricated. Authority on this specific issue is scant, although in at least one civil action it has been suggested that while a previous opening statement is not binding on a litigant, the statement can, under certain circumstances be considered by the trier of fact.[3] *Beyer Co. v. Fleischmann Co.*, 15 F.2d 465, 466 (6th Cir.1926).

---

**3.** A distinction is generally recognized between an attorney's judicial admissions, which, like any stipulation, can bind a party within a given lawsuit; and an attorney's less formal evidentiary admissions, which are statements made as a party's agent and which the trier of fact may evaluate as it sees fit. Note, *Judicial Admis-* *sions,* 64 Colum.L.Rev. 1121, 1121 (1964). We are of course concerned only with evidentiary admissions since no one claims that the opening statement from the second trial estopped McKeon from claiming that his wife had photocopied the receipts at his request.

We believe that prior opening statements are not *per se* inadmissible in criminal cases. To hold otherwise would not only invite abuse and sharp practice but would also weaken confidence in the justice system itself by denying the function of trials as truth-seeking proceedings. That function cannot be affirmed if parties are free, wholly without explanation, to make fundamental changes in the version of facts within their personal knowledge between trials and to conceal these changes from the final trier of fact.

Support for this conclusion may be found in the analogous issue of the admissibility of superseded pleadings in civil litigation. The law is quite clear that such pleadings constitute the admissions of a party-opponent and are admissible in the case in which they were originally filed as well as in any subsequent litigation involving that party. *Contractor Utility Sales Co. v. Certain-Teed Products Corp.*, 638 F.2d 1061, 1084 (7th Cir.1981); *Raulie v. United States*, 400 F.2d 487, 526 (10th Cir. 1968); D. McCormick, *Handbook of the Law of Evidence* 633–36 (2d ed.1972). A party thus cannot advance one version of the facts in its pleadings, conclude that its interests would be better served by a different version, and amend its pleadings to incorporate that version, safe in the belief that the trier of fact will never learn of the change in stories. As was explained in *Kunglig Jarnvagsstyrelsen v. Dexter & Carpenter, Inc.*, 32 F.2d 195, 198 (2d Cir.), *cert. denied*, 280 U.S. 579, 50 S.Ct. 32, 74 L.Ed. 629 (1929) by Judge Swan,

Error is now assigned to the receipt in evidence of the original complaint, which was offered by the defendant both as evidence of agency, and as a formal ratification of the contract. One ground of objection to its admission was lack of proof of authority of the [party's] attorney to bind his client by the averments of the pleading. Such an objection is clearly not sustainable. A pleading prepared by an attorney is an admission by one presumptively authorized to speak for his principal.

\*   \*   \*   \*   \*   \*

A further objection was based upon the fact that the complaint had been superseded by an amended pleading. This objection is likewise unavailing. When a pleading is amended or withdrawn, the superseded portion ceases to be a conclusive judicial admission; but it still remains as a statement once seriously made by an authorized agent, and as such it is competent evidence of the facts stated, though controvertible, like any other extra-judicial admission made by a party or his agent.... If the agent made the admission without adequate information, that goes to its weight, not to its admissibility. There was no error in receiving the original complaint in evidence.

Although we by no means equate the admissibility of inconsistent pleadings with the admissibility of inconsistent opening statements, we believe the analogy is correct insofar as consideration of whether a *per se* rule against the admission of the latter exists.[4]

We conclude, therefore, that there is no absolute rule preventing use of an earlier opening statement by counsel as an admission against a criminal defendant in a subsequent trial. We are not willing, however, to subject such statements to the more expansive practices sometimes permitted under the rule allowing use of admissions by a party-opponent. The rule itself has caused a substantial expenditure of ink by legal commentators seeking a coherent doctrinal theory explaining the use of admis-

---

**4.** This principle is not inconsistent with the long-established federal rule that a withdrawn guilty plea is not admissible in subsequent civil or criminal proceedings. Fed.R.Evid. 410; *Kercheval v. United States*, 274 U.S. 220, 47 S.Ct. 582, 71 L.Ed. 1009 (1927). The *Kercheval* rule is intended to permit a criminal defendant to exercise his right to a trial without imposing on that right conditions which make its exercise meaningless, *id.* at 224, 47 S.Ct. at 583. A criminal defendant's right to a trial does not carry with it a right to present in multiple trials contradictory versions of the facts that vary according to the nature of the prosecution's case.

sions, D. McCormick, *supra* at 628–31, and has resulted in "a lengthy academic dispute in which most courts have evinced little interest." 4 J. Weinstein & M. Berger, *Evidence* 801–135 (rev.perm.ed.1981).

Although we share that lack of interest, we note that the admissions rule is itself something of an anomaly since it is in some respects an exception to the general proposition that probative value and reliability are the touchstone of the law of evidence where non-privileged matters are concerned. Admissions may thus be used even though the statement was plainly self-serving when made, was not based upon the personal knowledge of the speaker and is in a form which would otherwise be inadmissible. D. McCormick, *supra* at 631–33; J. Weinstein & M. Berger, *supra* at 801–136. Why probative value and reliability carry so little weight in the case of the admissions rule is not clear, particularly since the use of admissions may be the trial equivalent of a deadly weapon. In all probability, these aspects of the rule are derived vestigially from an older, rough and ready view of the adversary process which leaves each party to bear the consequences of its own acts, no matter how unreliable these acts may be as proof. Whatever its derivation, however, we conclude that the evidentiary use of prior jury argument must be circumscribed in order to avoid trenching upon other important policies.

First, the free use of prior jury argument might consume substantial time to pursue marginal matters. Some witnesses may be available only at one trial, their testimony may change or other evidence may differ. Trial tactics may also change because of the earlier trial. If prior jury argument may be freely used for evidentiary purposes, later triers of fact will be forced to explore the evidence offered at earlier trials in order to determine the quality of the inconsistency between positions taken by a party. This will result in a substantial loss of time on marginal issues, diversion from the real issues and exposure to evidence which may be otherwise inadmissible and prejudicial.

Second, inferences drawn from an inconsistency in arguments to a jury may be unfair. In criminal cases, the burden rests on the government to present a coherent version of the facts, and defense counsel may legitimately emphasize the weaker aspects of the government's case. Where successive trials occur, the evidentiary use of earlier arguments before the jury may lead to seemingly plausible but quite prejudicial inferences. A jury hearing that in the first trial defense counsel emphasized the weakness of the prosecution's case as to the defendant's criminal intent, may well, when lack of proof of identity is argued at the second, be misled as to the government's obligation to prove all the elements at both trials.

Third, the free use of prior jury argument may deter counsel from vigorous and legitimate advocacy. Argument to the jury is a crucial aspect of any trial, and the truth-seeking process itself demands that the professional adversaries be allowed to put before the trier of fact all relevant argument regarding the inferences or factual conclusions possible in a particular case. Counsel should not, except when the truth-seeking purpose clearly demands otherwise, be deterred from legitimate argument by apprehension about arguments made to a jury in an earlier trial.

Fourth, where an innocent factual explanation of a seeming inconsistency created by the prior opening statement exists, the offer of that explanation may seriously affect other rights of the defense. Where the explanation may be offered to the trier of fact only through the defendant as a witness, the defendant may have to choose between forgoing the explanation or facing the introduction of a prior criminal record for impeachment purposes and waiver of the attorney-client privilege. Even if defense counsel can offer the explanation in a hearing under Fed.R.Evid. 104(a) outside the presence of the jury, that offer may expose work product, trial tactics or legal theories to the prosecution. These Hobson's choices may thus seriously impair the defense.

Fifth, as is clear from our disposition of this case, the admissibility of a prior opening statement may lead to the disqualification of counsel chosen by the defendant, a most serious consequence.

■ For these reasons, we circumscribe the evidentiary use of prior jury argument. Before permitting such use, the district court must be satisfied that the prior argument involves an assertion of fact inconsistent with similar assertions in a subsequent trial. Speculations of counsel, advocacy as to the credibility of witnesses, arguments as to weaknesses in the prosecution's case or invitations to a jury to draw certain inferences should not be admitted. The inconsistency, moreover, should be clear and of a quality which obviates any need for the trier of fact to explore other events at the prior trial. The court must further determine that the statements of counsel were such as to be the equivalent of testimonial statements by the defendant. The formal relationship of the lawyer as agent and the client as principal by itself will rarely suffice to show this since, while clients authorize their attorneys to act on their behalf, considerable delegation is normally involved and such delegation tends to drain the evidentiary value from such statements. Some participatory role of the client must be evident, either directly or inferentially as when the argument is a direct assertion of fact which in all probability had to have been confirmed by the defendant.

■ Finally, the district court should, in a Fed.R.Evid. 104(a) hearing outside the presence of the jury, determine by a preponderance of the evidence that the inference the prosecution seeks to draw from the inconsistency is a fair one and that an innocent explanation for the inconsistency does not exist. Where the evidence is in equipoise or the preponderance favors an innocent explanation, the prior opening statement should be excluded. We impose this requirement so as to allow leeway for advocacy and to lessen the burden of choice between the defendant's not explaining the inconsistency to the jury or sacrificing other valuable rights. Moreover, where the attorney-client privilege, the privilege against self-incrimination, the fear of impeachment by a prior conviction, apprehension over having to change attorneys, the revelation of work product, trial tactics, or legal theories of defense counsel may be involved in explaining the changes in the defendant's version of events, the court should offer an opportunity to the defense to present those reasons *in camera*, outside the presence of the jury and of the prosecution. *In camera* hearings are permitted where the government seeks to use grand jury testimony to overcome the attorney-client privilege or work product immunity, *In re John Doe Corp.*, 675 F.2d 482, 489–91 (2d Cir.1982), and similar considerations apply in the present circumstances.

■ Applying these principles to the present case, we conclude that the prior opening statement was properly admitted against McKeon under Fed.R.Evid. 801(d)(2)(B) and (C). The expert testimony about the xerox machine promised by Kennedy in the opening statement at the second trial was in support of a factual claim that Olive McKeon had not copied the documents. Kennedy's opening argument at the third trial, stating that Olive McKeon had indeed copied the documents at the request of her husband, was facially and irreconcilably at odds with the earlier assertion.

This inconsistency was not the result of differences in the evidence at the trials over which the defendant had no control or even of the behavior of a neutral witness.[5]

---

5. A defendant is free to call witnesses who have personal knowledge of material facts even though the defendant believes the witness is mistaken, so long as the witness is believed to be testifying in good faith. A defendant is also free not to call in a subsequent trial a witness who previously testified without an unfavorable inference being drawn. Indeed, under Fed.R. Evid. 607, a party may impeach a witness he or she has called, in recognition of the fact that parties have to take their witnesses as they find them.

An expert witness such as that promised by Kennedy differs from an ordinary witness in that the expert has no personal knowledge of the events underlying the lawsuit and is hired only after the relevant events occur. We have no reason to believe that McKeon's expert was not selected by McKeon's counsel with a view to the content of the testimony he would give, namely, testimony supporting the version in which Olive McKeon did not xerox the documents. The truth of this version of the facts was on a matter within McKeon's personal knowledge and which went to the heart of his defense. Absent some explanation to the trial judge, there was every reason to believe that McKeon participated in the development of trial strategy regarding this issue at both trials. He may reasonably be said, therefore, to have manifested a belief in the differing versions of the facts, Fed.R.Evid. 801(d)(2)(B), and to have authorized Kennedy to present them at trial. Fed.R.Evid. 801(d)(2)(C).

The offer of the expert testimony was a calculated act factually inconsistent with the version of events offered at the third trial. McKeon did not stand mute and put the government to its proof at the last trial. Rather, the defense offered the new version of the facts relating to the xeroxing of the documents at the very outset of trial. Having affirmatively opened the issue, McKeon had no more right to keep the later jury ignorant of the fact that he had earlier hired and promised another jury expert testimony supporting a different version of the facts than he would have had to preclude it from learning of inconsistent testimony he himself had given.

We thus conclude that the circumstances described above amply support an inference that the offer of expert testimony on the use of the bank's xerox machine may be regarded as the equivalent of a testimonial statement by McKeon that he did not ask his wife to copy the documents. They further support an inference that, knowing the expert's testimony was weak because it was untrue and would now be challenged by the expert's instructor, McKeon fabricated a new version of events. Absent an explanation for the radically different version of the facts offered at the third trial, we believe that Judge Platt had little choice but to admit the prior opening statement as evidence of fabrication demonstrating consciousness of guilt. No such explanation was proffered even though Judge Platt offered an *in camera* hearing on the reasons for the new version of events. If an innocent explanation for the inconsistency existed, but McKeon's counsel was unwilling to reveal it in open court for reasons explained above, this offer gave him ample opportunity to apprise the trial judge of that explanation without risk of a waiver of McKeon's rights or exposure of work product, trial tactics or legal theories.

## 2. *Kennedy's Disqualification as Trial Counsel*

Once Judge Platt ruled that the opening statement from the second trial was admissible, he properly recognized that Kennedy's continued role as McKeon's counsel in the presence of the jury was improper under N.Y. Jud. Law, Disciplinary Rule 5-102(A) (McKinney 1975). In *United States v. Cunningham*, 672 F.2d 1064 (2d Cir. 1982), we recently sought to accommodate Disciplinary Rule 5-102(A) with a defendant's interest in being represented by counsel of his choice. *Cunningham* is virtually on all fours with the instant case, including the identity of the counsel involved.

In *Cunningham*, a witness testified before a grand jury that defendant's trial counsel had told her, the witness, that certain important envelopes were "safe" and "if the government wanted the envelopes they would have to find them." *Id.* at 1068. The location of the envelopes was potentially an important issue at the actual trial, and the prosecution proposed to put the witness on the stand to testify as to her conversations with the defendant's trial counsel. On an interlocutory appeal following disqualification of counsel, we held that, if the witness's testimony were ruled to be admissible, the defendant's offer to waive his right to call his trial counsel

would be insufficient to alleviate the problems raised by Disciplinary Rule 5–102(A). If counsel were to cross-examine the witness as to her conversations with him, argue the credibility of her testimony to the jury, or suggest alternative interpretations of her account of the conversation, he would place himself in the position of an unsworn witness and implicitly put his own credibility at issue. *Id.* Since this is precisely the situation that Disciplinary Rule 5–102(A) was designed to avoid, *id.*, we held the Sixth Amendment interest in counsel of choice must give way when chosen counsel is so compromised. Although we have adopted a "restrained approach" with respect to disqualification of counsel, *Armstrong v. McAlpin,* 625 F.2d 433, 444 (2d Cir.1980); *Board of Education of N.Y. City v. Nyquist,* 590 F.2d 1241, 1246 (2d Cir.1979), disqualification will occur where the presence of counsel will taint the trial. *Id.* at 444–46. Such a taint occurs where counsel assumes a role as an unsworn witness whose credibility is in issue.

■ In the instant case, the jury learned that Kennedy, McKeon's lawyer, had made promises of expert testimony at the earlier trial to confirm Olive McKeon's non-role in the copying of the documents. Kennedy nevertheless wished to reserve the right to put McKeon on the stand, to have McKeon testify as to conversations he might have had with Kennedy prompting the change in statements and to argue McKeon's credibility as to these conversations. For a lawyer to retain a right to argue a witness's credibility regarding material conversations to which the lawyer was a party in order to explain other statements by the lawyer which are in evidence is, in light of *Cunningham,* untenable. Kennedy's insistence on retention of such a right thus made his limited disqualification as trial counsel entirely appropriate.

We have examined appellant's other claims and have determined they are without merit.

Affirmed.