UNITED STATES of America,

v.

Kwang Fu PENG, Defendant.

No. S 84 Cr. 823 (DNE).

United States District Court,
S.D. New York.

Feb. 8, 1985.

Rudolph W. Giuliani, U.S. Atty., S.D.
N.Y., Martin J. Auerbach, Asst. U.S. Atty.,
New York City, for plaintiff.

Polstein, Ferrara & Compriello, New
York City (Anthony J. Ferrara, New York
City, of counsel), for defendant.

## OPINION AND ORDER

EDELSTEIN, District Judge:

Information that came to light during the
trial of this case presents this court with

serious dilemmas. During the cross-examination of the government's first witness, the defendant's attorney made reference to a conference held at the defense attorney's office involving the witness, the defendant, the attorney, and one of the attorney's partners. The attorney therefore is a potential witness in the trial. This presents two problems. First, whether the defendant's attorney must be disqualified pursuant to Rule 5–102 of the Disciplinary Rules of the American Bar Association Code of Professional Responsibility ("DR 5–102") and second, whether such disqualification would require the court to declare a mistrial for one of the few times in this judge's thirty-three years on the bench.

## BACKGROUND

The defendant in this action is charged with one count of wire fraud in violation of 18 U.S.C. § 1343 and one count of interstate transportation of stolen property in violation of 18 U.S.C. § 2314. The government alleges, in substance, that defendant Peng stated to Geoffrey Galley, among others, that he was a representative of a far eastern government and that he was authorized to sell a large quantity of gold on behalf of that government. Galley allegedly entered into an agreement with Peng whereby Galley was to find a buyer for the gold. Pursuant to this agreement, Galley and the potential buyers gave Peng over $200,000.00, which money, according to the government, Peng took across state lines and spent for his personal use. Peng's defense at trial was that he believed in good faith all along that there was gold to sell, but that the transaction simply fell through. Moreover, Peng contends that under his agreement with Galley, the money was Peng's to spend and not refundable.

Galley was the government's first witness. He had the most contact with Peng during the period described in the indictment, and he testified as to his discussions and agreements with Peng. The subject of conversations Galley had after Peng's arrest was broached during the cross-examination of Galley by Peng's trial counsel, Mr. Ferrara. The relevant portion of the testimony is as follows:

Q: Did you negotiate with Mr. Skourlis in an attempt to resurrect this transaction after July 18, 1984?

A: No, sir.

Q: Did you have any discussions with Mr. Skourlis regarding his obtaining for you the identity of the seller of the gold involved in this transaction?

A: That is not an accurate representation of the discussion which took place which I will be delighted to state if you will allow me to.

Q: You did talk to Mr. Skourlis about this gold transaction, correct?

A: No.

Q: You did not talk to him about this gold transaction?

A: I don't believe an answer yes or no is adequate for the question.

Q: Did you talk to Mr. Skourlis?

THE COURT: Please give the answer you believe is adequate.

Q: Mr. Skourlis approached me and said, "Do you, sir, wish to meet with me," because there was a terrible misunderstanding. Mr. Peng had all the money and had not in fact, touched the money, and he could prove that all the statements that he had made concerning the availability of the gold were true, and so "I came to meet you at your office".

MR. FERRARA: I move to strike the response, Judge.

THE COURT: Denied.

Q: Did you offer to discontinue this proceeding, this criminal proceeding, if the money was returned to you?

A: You said to me—

Q: Answer the question.

A: No I did not offer to discontinue because it is not my proceeding.

Q: Aside from the conference in my office, aside from that conference, did you attempt, through Mr. Skourlis, to induce Mr.

Peng to identify the ultimate seller of the gold?

A: No, sir.

Q: Did you discuss that with Mr. Skourlis?

A: No, sir.

Q: Did you discuss Mr. Peng with Mr. Skourlis after the meeting in my office?

A: Mr. Skourlis, on several occasions, came to me with messages from yourself and Mr. Peng or what he told me were from yourself and Mr. Peng.

Q: Mr. Skourlis told you the messages were from me?

A: Yes.

Q: Did the meeting that we had in my office, did it end with a demand being made upon you for an additional two-hundred-thousand-dollars' payment?

A: It ended with a threat from you.

Q: Did it end with a demand?

A: No. it did not end with a demand; it was a threat.

Following this exchange, the court attempted to determine when this meeting took place. It was determined that the meeting occurred in July 1984, following the arrest of the defendant but prior to the original indictment handed down in October 1984. The court also inquired regarding the circumstances of the meeting, information which the court determined the jury was entitled to know. The following testimony was given:

Witness: Mr. Skourlis said to me that Mr. Peng and his lawyer were stating there was a complete misunderstanding. He still had all of our money and was able to prove that the material, the gold, was available for sale and the bank didn't know it.

I said he said the lawyer would like to meet with you. I said I would be happy to go and meet with him.

Court: Meet whom?

Witness: Meet the lawyer, not Mr. Peng, because the last thing I would like to do would be responsible for a man being incarcerated or found guilty of something if there was genuine error,

but I did not believe this was the case. I now was convinced he had been lying to me all the time.

The testimony places Mr. Ferrara, the defendant's trial counsel, in the position of a participant in one of the contested events relating to the alleged fraud. Thus, Mr. Ferrara is a potential witness in this action regarding the meeting at his office.

DISQUALIFICATION

Disciplinary Rule DR 5–102(A) of the American Bar Association Code of Professional Responsibility states:

If, after undertaking employment in contemplated or pending litigation, a lawyer learns or it is obvious that he or a lawyer in his firm ought to be called as a witness on behalf of his client, he shall withdraw from the conduct of the trial and his firm, if any, shall not continue representation in the trial, except that he may continue the representation and he or a lawyer in his firm may testify in the circumstances enumerated in DR 5–101(B)(1) through (4).

DR 5–101(B)(4) states that a lawyer may testify:

As to any matter, if refusal would work a substantial hardship on the client because of the distinctive value of the lawyer or his firm as counsel in the particular case.

The Second Circuit has examined the applicability of DR 5–102 in two recent cases. In both cases, the court stated the need to disqualify defense counsel when it becomes apparent that defense counsel is a potential witness. In *United States v. Cunningham*, 672 F.2d 1064 (2d Cir.), *cert. denied*, —— U.S.——, 104 S.Ct. 2154, 80 L.Ed.2d 540 (1982), the trial attorney was a likely witness to rebut the testimony of the government's witness regarding a conversation between the witness and the attorney. The court in *Cunningham* balanced the defendant's sixth amendment right to counsel of his choice against the need to preserve the highest ethical standards of professional responsibility. 672 F.2d at 1070. The court quoted Ethical Considera-

tion 5–9 [1] in stating that DR 5–102(A) would require the attorney and his firm to withdraw as trial counsel. *Id.* at 1074. This position was reaffirmed in *United States v. McKeon,* 738 F.2d 26, 34–35 (2d Cir.1984).

Mr. Ferrara contends that there are alternatives to disqualification which would permit him to continue as trial counsel without violating the ethical rules. Ferrara states that he will not testify; instead he will have a member of his firm who was present at the meeting with Galley testify. This proposal is rejected.

■ Ferrara's suggestion that the member of his law firm who also attended the meeting may testify is patently contrary to both the letter of DR 5–102 as well as the court's decision in *Cunningham, supra,* 672 F.2d at 1074 ("Disciplinary Rule 5–102(A) would require that [defense counsel] and his firm withdraw as trial counsel"). It is clear that even if Ferrara does not testify, "the impropriety forseen by the drafters of the Disciplinary Rules" is not avoided. *Cunningham, supra,* 672 F.2d at 1074.

As in *Cunningham,* there remains the danger that "if [Ferrara] were to cross examine [Galley and/or Skourlis],[2] ... or if in his summation to the jury he were to argue the plausibility of [Galley and/or Skourlis'] testimony or to offer an interpretation of the words attributed to him, he would implicitly be testifying as to his version of the conversation.... Since as an unsworn witness he would not be subject to cross-examination or explicit impeachment, the interest sought to be protected by the Disciplinary Rules would be even more seriously eroded than if [Ferrara] appeared as a sworn witness." *Id.* at 1074–75; *see People v. Bonilla,* 101 Misc.2d 146, 149, 420 N.Y.S.2d 665, 668 (Bronx Cty. Sup.Ct. 1979) ("testimony" under code includes attorney's direct or indirect participation in the events being litigated). Accordingly, the ethical concerns are not at all alleviated by Ferrara's proposal not to testify.

The suggestion is also unacceptable because a jury, whether it is the one originally impanelled or one impanelled in a new trial, would learn that Ferrara was present during the post-arrest discussions with Galley. Thus, even if someone other than Ferrara testifies as to the conversation, Ferrara would still be placed before the jury in the dual roles of both advocate and unsworn witness, with personal knowledge of disputed facts. Moreover, as the government points out, the fact that Ferrara's proposed witness is his partner would inevitably be disclosed to the jury. The government on cross-examination of the witness would be entitled to impeach his credibility and competence by showing that he is affiliated with defense counsel's firm and thus benefitting from the legal fee paid by defendant Peng. Clearly, the need to preserve the highest ethical standards of professional responsibility require that Ferrara's partner not be permitted to testify.[3]

1. EC 5–9 states:
   If a lawyer is both counsel and witness, he becomes more easily impeachable for interest and thus may be a less effective witness. Conversely, the opposing counsel may be handicapped in challenging the credibility of the lawyer when the lawyer also appears as an advocate in the case. An advocate who becomes a witness is in the unseemly and ineffective position of arguing his own credibility.

2. Mr. Skourlis was scheduled to be the government witness following Galley.

3. Rule 3.7 of the American Bar Association Model Rules of Professional Responsibility are more liberal in allowing a member of an attorney's firm to act as trial counsel when the attorney is likely to be a necessary witness. *See also* Model Rules 1.10, 1.7 and 1.9. The Model Rules, however, have not been enacted by New York State, *see* N.Y.Jud. Law, app. DR 5–102(A) (McKinney 1975), nor were they applied or even cited by the second circuit in the very recent case of *McKeon, supra,* 738 F.2d at 34–5. Moreover, based on the reasons stated above, the court finds that the jury taint will not be alleviated by use of Ferrara's partner as trial counsel. Under the prevailing ethical standards in the legal profession, Ferrara's disqualification necessarily precludes the retention of his partner as trial counsel.

Ferrara directs the court to cases which he views as supporting his continued participation as trial counsel. The reliance on these cases is misplaced. In *United States v. Armedo-Sarmiento,* 545 F.2d 785 (2d Cir.1976), *cert. denied,* 430 U.S. 917, 97 S.Ct. 1330, 51 L.Ed.2d 595 (1977), defendants contended on appeal that it was improper for an Assistant United States Attorney, who did not prosecute the case, to testify on behalf of the government. The court noted that, while it does not encourage testimony by members of the United States Attorneys staff, "we would not go so far as to disqualify such person as witness in a case in which he plays no other role." *Id.* at 793. Further, the defendants did not voice a timely objection at trial to the government's use of an Assistant United States Attorney as witness. *Id.* Had they timely objected "perhaps a less controversial [witness] could have been found." *Id.* In this case, no witness "less controversial" than Ferrara's partner is available to testify. Moreover, the imputed disqualification rule must be applied differently to United States Attorneys. It would not have been feasible for the court in *Armedo-Sarmiento* to disqualify all the attorneys in the United States Attorneys office, merely because one of them was to be a witness. On the other hand, there are numerous defense lawyers capable of handling Peng's defense besides Ferrara and the members of his firm.

Ferrara cites *United States v. Fiorillo,* 376 F.2d 180 (2d Cir.1967), as an example of an attorney being able to testify while remaining as trial counsel. In *Fiorillo,* the court of appeals found no error in the trial court's refusal to allow defendant's trial counsel to withdraw after trial counsel decided to take the stand to contradict the testimony of a government witness. *Fiorillo,* however, was decided before the promulgation of the Code by the American Bar Association in 1969, its adoption by the New York State legislature effective January 1, 1970, and before the Second Circuit's decisions in *Cunningham* and *McKeon.* To the extent that *Fiorillo* permits trial counsel to serve as both advocate and witness, it has been overruled by subsequent cases. Any attempt to distinguish *Cunningham* and *McKeon* would subvert the purpose of the Disciplinary Rules and the spirit of these cases.

■ Ferrara further contends that his testimony would not be material, but merely concerns an ancillary matter, insufficient to justify his disqualification. Under Ethical Consideration 5–10, the materiality of the attorney's testimony is an important factor in determining whether he should remain. All doubts, however, under EC 5–10, are to be resolved in favor of the attorney's withdrawal or disqualification. The court finds that the subject of Ferrara's testimony is highly material to the proper cross-examination of the government's witnesses as well as the defense raised by Ferrara in his opening statement.

Both Galley and Skourlis, both of whom engaged in post-arrest conversations with Ferrara and Peng, are important government witnesses. At trial, Ferrara raised the issue of Galley's hostility and/or bias against Peng. Ferrara stated,

> In short, ladies and gentlemen, this is a failed business deal. Even now Mr. Galley is suing the Golden Nugget, trying to get $200,000 from them. I submit to you that he is trying to use the criminal term of this court to get a civil recovery. No crime was committed.

Excerpt of Defendant's Opening Statement, January 29, 1985 ("Ferrara's Opening"), at 4. Based on his questioning of Galley on cross-examination, Ferrara apparently was trying to prove that after Peng's arrest, Galley offered to "discontinue" this criminal proceeding if the $200,000 was returned to him. However, Ferrara could not properly do so without him or his partner becoming a sworn witness to testify as to what transpired during the conference in Ferrara's office. Peng is entitled to have his attorney zealously cross-examine Galley and Skourlis and to offer evidence as to their possible pecuniary interest in the outcome of this trial and their possible hostility towards the defendant.

*United States v. Gambler,* 662 F.2d 834, 837, 839 (D.C.Cir.1981).

The discussions in Ferrara's office also go to the heart of Peng's "good faith" defense. Ferrara in his opening statement stated:

Indeed, I submit to you that the documents produced in this trial will show that Mr. Peng had a good faith basis to believe that there was a deal to be made, and that beginning in the summer of 1983, and continuing to the summer of 1984, he worked very hard in order to attempt to bring the deal about; and indeed, after he was arrested, people still approached him in an attempt to bring the deal about.

Ferrara's Opening at 4. The post-arrest conference in Ferrara's office, as well as any other post-arrest communications by Galley and/or Skourlis with Peng and Ferrara are relevant to Ferrara's proffered good faith defense. Ferrara is therefore a material witness on the issue of Peng's fraudulent intent, an element of the wire fraud count.

Peng contends that under the circumstances of this case, the disqualification of Ferrara's "distinctive" services would work a "substantial hardship" on Peng. Accordingly, he contends that under the exception to DR 5–102, his retention of Ferrara would not violate the rule. Ferrara points out that because the superseding indictment in this case charges a complex scheme to defraud, involving numerous documents, he has had to spend over one hundred hours in preparation for trial. Mr. Peng, understandably, does not want to pay another fee for substituted counsel. Moreover, Peng desires a speedy resolution of this criminal matter.

The court does not find that the disqualification of Ferrara will work a "substantial hardship" on Peng sufficient to justify Ferrara's continued representation. Because of the strong policy considerations in support of the advocate-witness rule, courts have given the "substantial hardship" exception "a very narrow reading." *United*

*States v. Johnston,* 690 F.2d 638, 642 n. 9 (7th Cir.1982). Thus, it has been noted: the additional financial burden placed upon the client by having to retain new counsel, as well as the fact that the attorney can more effectively represent the client in the matter do not in and of themselves present 'substantial hardship' within the meaning of DR 5–101(B)(4), and thus do not constitute sufficient bases upon which to accept or continue legal representation.

Digest of Opinion of Maryland State Bar Association Committee on Ethics, Opinion 84–96, *printed in* ABA/BNA Lawyers' Manual on Professional Conduct 402, 402–03 (received July 17, 1984); *see Grossman v. Commercial Capital Corp.,* 59 A.D.2d 850, 850, 399 N.Y.S.2d 16, 17 (1st Dep't 1977) ("pecuniary hardship alone is insufficient to avoid disqualification").

Withdrawal of counsel and substitution of new counsel is usually costly to the client. As the court stated in *MacArthur v. Bank of New York,* 524 F.Supp. 1205, 1210 (S.D.N.Y.1981), "if the expense and delay routinely incident to disqualification satisfied the substantial hardship exception, that exception would soon swallow the rule." Ferrara knew or should have known since the original indictment was filed in October, if not from the time of his participation is the meeting itself, that he or a member of his firm was a potential witness. He could have minimized the expense to his client by bringing the ethical problem to this court's attention sooner. *See id.; see also United States v. Ricotta,* 84 Cr. 288 (DNE), transcript of September 11, 1984 conference at 20–32, transcript of September 12, 1984 conference at 1–12. The court will not provide an incentive to counsel to accumulate the financial hardship to his client of withdrawal, in order to circumvent the requirements of DR 5–102.

Moreover, Ferrara possesses no "distinctive value" which would warrant his retention. As in *Norman Norell, Inc. v. Federated Dep't Stores,* 450 F.Supp. 127, 130 (S.D.N.Y.1978), "the 'distinctive value'

of [Ferrara] to [Peng] would appear not to be as counsel but as witness, the very role barred by DR 5–102." That Ferrara has prepared extensively for trial does not make his services distinctly valuable within the meaning of the rule. The court recognizes that this fraud action is somewhat complicated; however, the need to preserve the highest ethical standards of the legal profession is as imperative in complex cases as it is in simple ones. Substituted counsel will be provided ample time to prepare for trial, pursuant to the provisions of the Speedy Trial Act. See *infra* note 6.

Ferrara contends that the American Bar Association Project on Standards for Criminal Justice, Standards Relating to the Prosecution Function and the Defense Function § 4.3(d)[4] applies to the situation presented here. The standard permits a lawyer to remain as trial counsel in situations where he is using statements made in his and a third person's presence to impeach the testimony of that witness at trial.

■ There is a major defect in applying this standard to the present situation. The standard applies to witness interviews. Galley's testimony at trial indicates that the meeting was more than a witness interview. The meeting was arranged to clear up a possible misunderstanding regarding the completion of the gold transaction. Thus, the events transpiring at Ferrara's office are of such a nature as to be relevant to the alleged fraud and will be contested at trial. This certainly cannot be within the situations contemplated by the Bar Association Standard.

The court finds that the "taint" of the trial that would occur if counsel were to remain outweighs the defendant's sixth amendment interest in choice of counsel, *see United States v. McKeon*, 738 F.2d 26, 35 (2d Cir.1984), and therefore Ferrara must be disqualified as trial counsel.

4. Section 4.3(d) states: ·
Unless the lawyer for the accused is prepared to forego impeachment of a witness by the lawyer's own testimony as to what the witness stated in an interview or to seek leave to

## MISTRIAL

The defendant's attorney requested a mistrial at trial following the disclosure of the meeting at his office. This motion was subsequently withdrawn at a conference held the following day. The withdrawal of the motion, however, does not preclude the court from declaring a mistrial on its own initiative. *United States v. Scott*, 437 U.S. 82, 92, 98 S.Ct. 2187, 2194, 57 L.Ed.2d 65 (1978).

■ A mistrial is appropriate "whenever, in [the trial judge's] opinion, taking all the circumstances into consideration, there is a manifest necessity for the act, or the ends of public justice would otherwise be defeated." *United States v. Perez*, 9 Wheat. 579, 580, 6 L.Ed. 165 (1824). This standard is not a rigid one, rather the standard "abjures the application of any mechanical formula by which to judge the propriety of declaring a mistrial in the varying and often unique situations arising during the course of a criminal trial." *Illinois v. Somerville*, 410 U.S. 458, 462, 93 S.Ct. 1066, 1069, 35 L.Ed.2d 425 (1973).

In this case, a finding of "manifest necessity" is based on several grounds. Foremost is the affect on the weight the jury will give to Ferrara's opening statement and examination of Galley once Ferrara is substituted and he or a member of his firm takes the stand. This is precisely the taint that the Disciplary Rules seek to avoid. Specifically, it is "the fear that the ... argument might be so identified in the minds of the jury that they would give to the argument a testimonial credit and effect, as if the oath of the counsel as witness were pledged to it, and thus be unduly impressed with its weight." 6 Wigmore, Evidence § 1911 (Chadbourn rev. 1976). This is the same rationale that requires Ferrara's disqualification. *See MacArthur v. Bank of New York*, 524 F.Supp. 1205, 1207 (S.D.N.Y.1981). Under these circum-

withdraw from the case in order to present his impeaching testimony, the lawyer should avoid interviewing a prospective witness except in the presence of a third person.

stances, the absence of a viable alternative to disqualification also forecloses any alternative other than a mistrial.

Ferrara suggests that the taint could be avoided by instructing the jury to disregard Galley's testimony and not to give Ferrara's testimony undue weight. This proposal, however, would not ameliorate the taint. It is naive to assume that the prejudicial effect of statements made during trial can always be overcome by jury instructions. *Krulewitch v. United States*, 336 U.S. 440, 453, 69 S.Ct. 716, 723, 93 L.Ed. 790 (Jackson, J., concurring). In this case, the court finds that the prejudicial effect of Ferrara's remarks during his opening statement and Galley's testimony cannot be remedied by jury instructions. Any testimony the jury hears regarding post-arrest conversations with Peng will be identified with Ferrara's opening remarks. Moreover, because Ferrara, now a likely witness, has cross-examined Galley as to the post-arrest conversations, the jury will be confused as to Ferrara's dual roles. Finally, "the jury would conceivably speculate to the prejudice of either party as to the reason counsel had been changed after two days of testimony." *McArthur v. Bank of New York*, 524 F.Supp. 1205, 1207–08 (S.D. N.Y.1981).

The second basis for the mistrial is that an extended period of time will elapse before the resumption of trial with the defendant's new counsel. It is true that a short continuance is not in and of itself sufficient to warrant a mistrial, *see Dunkerley v. Hogan*, 579 F.2d 141, 147 (2d Cir. 1978) ("short" 7–10 day continuance does not provide "manifest necessity"), *cert. denied*, 439 U.S. 1090, 99 S.Ct. 872, 59 L.Ed.2d 56 (1979); *see also Mizell v. Attorney Gen. of the State of New York*, 586 F.2d 942, 947 (2d Cir.1978) (continuance

from Thursday until Monday did not require dismissal of jury), *cert. denied*, 440 U.S. 967, 99 S.Ct. 1519, 59 L.Ed.2d 783 (1979), however, in this instance the length of the continuance is uncertain and is likely to be lengthy.[5]

Mr. Ferrara stated that over 100 hours of preparation were involved in this very complex case and that a new attorney may require even more time. Further, defendant will require additional time to obtain new counsel. It is thus impractical to retain the jury that had already been impanelled. *See MacArthur v. Bank of New York*, 524 F.Supp. 1205, 1207 (S.D.N.Y. 1981).[6]

■ The court finds that based on these factors there is a "manifest necessity" to declare a mistrial because it is impossible at this point for both sides to receive a fundamentally fair trial, *see Dunkerley v. Hogan*, 579 F.2d 141, 145 (2d Cir.1978), *cert. denied*, 439 U.S. 1090, 99 S.Ct. 872, 59 L.Ed.2d 56 (1979), as well as the impracticality of holding the jury.

Finally, it must be noted that the cause of the mistrial falls squarely on the shoulders of Mr. Ferrara. The court was not given the slightest indication that a problem existed regarding meetings with Galley. At the least, Ferrara should have brought this matter to the court's attention so that it could be resolved before the jury was empanelled. The court has been faced with similar situations in the past in which the court avoided the need for a mistrial by resolving the ethical dilemma well in advance of trial. *See, e.g., United States v. Ricotta*, 84 Cr. 288 (DNE), transcript of September 11, 1984 conference at 20–32, transcript of September 12, 1984 conference at 1–12.

---

**5.** The court is hesitant to keep the jury for an extended period. The jury would need to be called back well beyond their appointed term. *Compare Mizell, supra,* 586 F.2d at 947 (five day continuance would not require jury to serve beyond their appointed term).

**6.** It is unclear whether the Speedy Trial Act would establish a 30 day minimum on the re-

sumption of trial. While trials have been recommenced shortly after the declaration of a mistrial, the rationale for the 30 day minimum—insuring that defense counsel have adequate time in which to prepare for trial—is applicable to a mistrial resulting from the substitution of counsel.

## CONCLUSION

The court finds that DR 5–102 requires that Mr. Ferrara be disqualified from continuing as the defendant's trial counsel in this case. The court also finds that a mistrial must be declared because of "manifest necessity." The defendant will be given an opportunity to obtain substitute counsel and for that counsel to prepare before the new trial is commenced. A conference will be scheduled one week from the filing of this Opinion with substitute counsel to establish a schedule for the commencement of the trial.

SO ORDERED.