**UNITED STATES of America,**
**Appellee,**

v.

**Baldassare AMATO, Kevin Antinuche, Massimo Buscemi, Salvatore Chiaramonte, Giovanni D'Aleo, Joseph D'Aleo, Riccardo Fenoaltea, Filippo Fiordilino, Frank Guidice, Robert Iacobelli, Zaim Kolar, Tudor Moga, Vincent Moreno, Salvatore Pugliese, Vincenzo Anthony Sciacca, Florian Stoica, Brian Turk, Defendants.**

Joseph O'Kane, Defendant–Appellant.

Docket No. 02–1603.

United States Court of Appeals,
Second Circuit.

Argued: Jan. 5, 2004.

Decided: Jan. 21, 2004.

James E. Neuman, Mischel, Neuman, & Horn, P.C. New York, NY, for Defendant–Appellant.

Barbara Underwood, Assistant United States Attorney for the Eastern District of New York (Roslynn R. Mauskopf, United States Attorney for the Eastern District of New York, on the brief, Tracy Lee Dayton, David C. James, Assistant United States Attorneys, of counsel), New York, NY, for Appellee.

Before: FEINBERG, WESLEY,
Circuit Judges and PAULEY, District
Judge.*

PER CURIAM.

Defendant appeals from the October 8, 2002 judgment of the United States District Court for the Eastern District of New York (Johnson, *J.*). He raises a number of issues on appeal all of which, save one, are addressed in a summary order issued contemporaneously with this decision. We assume familiarity of the facts and recite only those that relate to defendant's re-

---

* The Honorable William H. Pauley III, District Court Judge for the Southern District of New York, sitting by designation.

maining contention—whether the district court's trial decision to admit into evidence a letter from defendant's former counsel was proper.

Defendant was charged with several crimes including attempting to tamper with a cooperating witness, Anthony Christopher, by using Todd Labarca and Patrick DiPierro as intermediaries. Labarca, a hostile witness under a grant of immunity, testified at trial that in the spring of 2000 he visited defendant on three occasions. At that time, Labarca was on probation, a condition of which prevented him from associating with anyone who had a felony conviction, such as defendant. Labarca had not seen or spoken to defendant for over seven years.

Labarca testified that, during the first visit, defendant identified Christopher as a cooperating witness in his case. Defendant requested that Labarca deliver a message to Christopher.[1] Labarca was also told to ask Christopher if he would speak to defendant's private investigator. Though Labarca knew Christopher and where Christopher lived, he did not want to deliver the message himself. Rather, Labarca told defendant that his former brother-in-law, DiPierro, was close to Christopher and that Labarca would send defendant's message to Christopher through him. After Labarca met with DiPierro, he returned to tell defendant that DiPierro had agreed to pass the message to Christopher. Labarca then visited defendant a third time to advise defendant that Christopher, in fact, "got the message."

DiPierro—a New York City police officer—also testified at trial. He confirmed that he agreed to approach Christopher regarding defendant's case. According to DiPierro, Labarca instructed him to tell Christopher that defendant's private investigator wanted to speak with him. DiPierro also noted that Labarca specifically referred to Christopher as a "rat" and that defendant "thought [Christopher] was a rat." Christopher testified that DiPierro made it abundantly clear that Labarca—also known as T–Bone—wanted to speak with him about defendant's case, but Christopher indicated that DiPierro never mentioned a private investigator.

The government presented evidence of this conduct at a pretrial hearing in support of a motion to revoke defendant's bail. Defendant was represented at the hearing by Anthony Ricco and Ronald Rubinstein. After the government presented its evidence, defendant called Rubinstein as a witness. The government raised a concern that Rubinstein's appearance as a witness in the case might require his disqualification as defendant's attorney. During this discussion Rubinstein made an offer of proof as to his testimony. In defendant's presence, Rubinstein indicated that defendant believed Christopher was a "rat" and that Rubinstein had authorized defendant to "use his friends" to find Christopher's address so that Rubinstein and an investigator might interview him. Ultimately defendant did not call Rubinstein as a witness at the hearing.

The district court revoked defendant's bail. On March 15, 2001, Rubinstein submitted a letter to the Court in support of a motion for reconsideration of that decision. Rubinstein claimed that defendant's effort was only an attempt in "an efficient and cost effective way" to ascertain Christopher's address and determine if he would

---

1. While it is unclear what the specific content of the "message" was, given the routine use of violence by defendant and his associates, there could be no doubt about the fate that awaited a "rat." Indeed, Christopher himself had previously been beaten with a baseball bat when suspected of cooperating with the government.

be interviewed. Rubinstein elaborated that, "[w]hile [defendant] knew that Christopher lived in Queens, he did not know the address, and wanted to arrange for counsel and an investigator to interview Christopher."

During the cross-examination of Labarca at trial, attorney Ricco elicited that contrary to the representations in the Rubinstein letter, defendant had not sought Christopher's address from Labarca. After noting the inconsistency between this testimony and the letter, the government moved to admit the Rubinstein letter. The court admitted the letter.

 Defendant's principal contention is that the Court "ignored the procedures mandated by *McKeon.*" Although the district court explicitly considered *United States v. McKeon,* 738 F.2d 26 (2d Cir. 1984), that case is inapposite. In *McKeon,* the government introduced, at defendant's retrial, his counsel's opening statement from an earlier trial, which contained assertions inconsistent with his subsequent defense theory. *See id.* at 28. The Court noted that "statements made by an attorney concerning a matter within his employment may be admissible against the party retaining the attorney." *Id.* at 30 (quotation marks and citation omitted). However, the Court concluded that "the evidentiary use of prior jury argument must be circumscribed in order to avoid trenching upon other important policies." *Id.* at 32. The Court outlined factors and procedures a district court should consider and follow before admitting an attorney's prior jury argument.

In *United States v. Arrington,* 867 F.2d 122, 127–28 (2d Cir.1989), this Court specifically limited *McKeon* to a defense attorney's prior jury argument. We upheld the admission of testimony concerning a defense attorney's alleged threats at a meeting with a cooperating government witness and rejected the argument that before admitting such testimony the Court was required to follow the *McKeon* procedures: "Contrary to defendant's assertion that these procedures apply to the use of all statements by defense counsel, we clearly stated in *McKeon* that we were 'circumscrib[ing] the evidentiary use of *prior jury argument.*'" 867 F.2d at 127 (quoting *McKeon,* 738 F.2d at 33, alterations in *Arrington*). The Court thus found "no support for [defendant's] contention that there are special procedures to be followed, or balancings to be performed as a prerequisite to the evidentiary use of a defendant's counsel's out-of-court statements." *Id.* at 128.

The Rubinstein letter is more akin to an out-of-court statement than a jury argument. An examination of the five factors that *McKeon* cited in support of its circumscribed rule of admissibility only reinforces this conclusion. First, *McKeon* noted that admission of a jury argument from a prior trial may result in a waste of time on collateral issues because "later triers of fact will be forced to explore the evidence offered at earlier trials in order to determine the quality of the inconsistency between positions taken by a party." 738 F.2d at 32. That concern is inapplicable here as defendant did not seek to introduce any additional evidence about his bail revocation proceedings to place the letter in proper context. Admission of the letter did not consume any more trial time than was required to read the redacted letter to the jury.

Second, *McKeon* observed that admission of defense counsel's jury arguments from an earlier trial may be misleading because the jury may view counsel's earlier reliance on weaknesses in the government's evidence on certain matters as an implied concession on other elements of the case. *See id.* That concern is similar-

ly inapplicable. Rubinstein's assertion did not rely on the government's failure of proof; rather it affirmatively put forth defendant's version of the facts. The jury could not have been misled into believing that Rubinstein's contentions impliedly conceded some other aspect of the government's case.

Third *McKeon* expressed concern that counsel should not be "deterred from legitimate argument by apprehension about arguments made to a jury at an earlier trial." *Id.* That factor carries little weight when counsel's prior statement is an out-of-court representation of fact rather than a jury argument. There is no reason for concern that counsel will be unfairly deterred from legitimate advocacy if the jury is permitted to learn about representations of fact made to obtain defendant's release on bail that are relevant to the issues at trial.

Fourth, *McKeon* noted that a defendant's explanation for a prior inconsistent argument may compromise other rights such as the Fifth Amendment privilege, the attorney-client privilege or work-product protection. *See id.* Here, defendant waived any claim of privilege that might have attached to his conversations with Rubinstein about contacting Christopher by offering Rubinstein as a witness at the bail hearing and submitting Rubinstein's letter to the court. Consequently, the fourth *McKeon* factor is also inapplicable.

Finally, *McKeon* expressed concern that admission of counsel's prior argument might lead to counsel's disqualification. *Id.* at 33. Rubinstein was disqualified for other reasons before the motion to admit the letter was made.[2] Consequently, this factor is also not applicable.

It is abundantly clear that the admissibility of the Rubinstein letter is not governed by *McKeon* but rather the Federal Rules of Evidence. *See* Fed.R.Evid. § 801(d)(2)(D).[3] Under that rule, a statement is admissible against a party if it is made "by the party's agent or servant concerning a matter within the scope of the agency or employment, made during the existence of the relationship." Defendant does not dispute that these criteria were met nor would there be merit to such an argument.

Accordingly, the district court's decision to admit the Rubinstein letter is AFFIRMED.

---

2. After the bail revocation hearing, the government accused Rubinstein of direct wrongdoing. Specifically, the government submitted letters to the court indicating that the government's continuing investigation resulted in evidence that the firm of Rubinstein & Corrozo, P.C. was affirmatively involved in a plan to intimidate Christopher. Based upon those allegations the court disqualified Rubinstein. The impact, if any, of the disqualification is not raised on appeal.

3. Defendant does not address Fed.R.Evid. § 801(d)(2)(D). *Rather his entire claim is that the district court's decision was improper in light of McKeon. As noted above, McKeon is inapposite, and the district court properly admitted the letter under Rule 801(d)(2)(D). See United States v. Brandon, 50 F.3d 464, 468 (7th Cir.1995)* ("an attorney may be the agent of his client for purposes of Rule 801(d)(2)(D) so long as the important policies concerning effective assistance of the counsel ... are preserved.").