**ESTATE OF Virginia C. ANDREWS, Deceased, by Eugene C. ANDREWS and Charles E. Payne, Co–Executors, Plaintiff,**

**v.**

**UNITED STATES of America, Defendant.**

**Civ. A. No. 2:92cv97.**

United States District Court, E.D. Virginia, Norfolk Division.

Oct. 27, 1992.

Philip Ray Farthing, Payne, Gates, Farthing & Radd, Norfolk, Va., for plaintiff.

George M. Kelley, III, U.S. Atty.'s Office, Norfolk, Va., Harry J. Giacometti, Margaret M.E. Earnest, U.S. Dept. of Justice, Trial Attys., Tax Div., Washington, D.C., for defendant.

## MEMORANDUM OPINION AND ORDER

PAYNE, District Judge.

The issue before the court is whether counsel for plaintiff, the Estate of Virginia C. Andrews ("Estate"), should be disqualified from representing the Estate in this tax refund action when trial counsel's law partner is a party to this action in his representative capacity as a co-executor of the Estate and when the partner will be a material witness at trial. For the reasons set forth below, the Estate's counsel is disqualified from representing the Estate in this action.

## STATEMENT OF FACTS

At the time of her death on December 19, 1986, Virginia C. Andrews had written seven commercially successful books and was a popular novelist. Prior to her death, Andrews' closely held corporation, Vanda Productions Ltd. ("Vanda"), negotiated a new publishing contract with Andrews' publisher, the Pocket Books Division of Simon & Schuster, Inc. ("Simon & Schuster"), calling for Andrews to write two additional novels. The contract was dated October 27, 1986 ("October contract"), and Andrews signed the October contract on November 11, 1986. Andrews died approximately five weeks later.

On December 23, 1986, Charles E. Payne, a member of the law firm of Payne, Gates, Farthing, & Radd, P.C., was named a co-executor of the Estate. Soon after Andrews' death, the executors, including Payne, together with Andrews' literary agent, Anita Diamant, and Simon & Schuster, implemented a plan to continue publishing books in the V.C. Andrews series. The first step in the plan was to find a ghostwriter who could copy successfully Andrews' writing style. After a considered search, a suitable ghostwriter was identified. Accordingly, on March 20, 1987, the Estate, through Vanda, entered into a contract with the ghostwriter ("First Writer's Contract") to write the two novels called for in the October contract. Payne, together with Philip R. Farthing—Payne's law partner and trial counsel in the present case—negotiated the terms of this contract on behalf of the Estate. *See* Diamant Deposition, pp. 43–44.

The Estate, also through Payne, negotiated a contract with Simon & Schuster in March 1987 whereby Simon & Schuster agreed to pay certain advances on the two ghostwritten books, which were to be re-

paid if the books were not satisfactory to the publisher. In August 1987, Simon & Schuster accepted the first ghostwritten manuscript; the book was released to the publisher in November 1987.

Because this book was acceptable to the publisher, the Estate negotiated and signed another contract with Simon & Schuster on January 19, 1988, for three additional ghostwritten books. Represented by Payne, the Estate then negotiated and signed a second contract with the ghostwriter on April 18, 1988 ("Second Writer's Contract") to write these books.

As a result of the commercial success of these efforts, the Estate and Simon & Schuster entered into a third contract for three books on May 11, 1989. To provide for these three additional books, the Estate, again represented by Payne, negotiated and signed an agreement with the ghostwriter on May 14, 1991, amending the Second Writer's Contract. To date, eight ghostwritten novels have been written under these agreements.

After Andrews' death, her Estate filed the required federal estate tax return together with a payment in the amount of $2,057,784.50. On November 16, 1990, the Internal Revenue Service assessed a deficiency of additional federal estate taxes against the Estate in the amount of $649,-201.77. According to the government, this deficiency represented the value of Andrews' name that the Estate had failed to include in the assets reported on the Estate's initial federal estate tax filing. The Estate paid this assessment with interest.

On February 16, 1992, the Estate, represented by Payne's law partner, Farthing, filed this action seeking a refund of the deficiency assessment and further seeking an award of attorney's fees. According to the Estate, the deficiency assessment was unwarranted because on the date of Andrews' death, her name had no additional independent value. The principal issues at trial are expected to be whether Andrews' name and likeness were an asset of the Estate at the time of her death, and, if so, what the value of that asset was at that time.

In support of its case, the government plans to present evidence of certain post-death events, including the contracts entered into between the Estate and the ghostwriter, to establish that Andrews' name was a valuable asset at the time of her death. The Estate objected to this evidence and filed a motion *in limine*, which the court denied on September 28, 1992.

Trial was originally set in this case for October 1, 1992. Soon after the case was assigned for trial, the government moved for a continuance on September 28, 1992, on the ground that the Estate belatedly had provided it with a report of the Estate's expert witness. The Estate opposed this motion. The next day, however, the Estate moved for a continuance on the ground of attorney illness. For these reasons, the court continued the trial until November 2, 1992.

During a conference call with the parties on September 29, 1992, the court advised the parties that, following a review of the Final Pretrial Order and the briefs submitted in connection with the Estate's motion *in limine*, the court questioned whether Farthing, and the firm of Payne, Gates, Farthing, & Radd, P.C. could continue to represent the Estate as trial counsel considering that Payne apparently would testify on disputed issues on the Estate's behalf. After referring the parties to provisions of the Virginia Code of Professional Responsibility ("VCPR"), which are applicable in this court pursuant to Local Rule 7(I), and to relevant case law, the court asked the parties to submit briefs on the issues of whether disqualification was required under Disciplinary Rule ("DR") 5–101(B) or DR 5–102(A) and, if so, whether those rules can be waived, because the government indicated it was willing to waive disqualification so long as Payne did not participate as counsel at trial. The parties submitted simultaneous briefs on these issues and oral argument was held on October 6, 1992.

## DISCUSSION

The VCPR, which sets "[t]he ethical standard relating to the practice of law in this court," Local Rule 7(I), consists of

Canons, DR's, and Ethical Considerations ("EC"). "The Canons are statements of axiomatic norms, expressing in general terms the standards of professional conduct expected of lawyers in their relationships with the public, with the legal system, and with the legal profession." VCPR, 11 Va.Code Ann. Pt. 6, § II, Preamble (Michie 1992). The EC's "are aspirational in character and represent the objectives toward which every member of the profession should strive." *Id.* The DR's, however, "are mandatory in character" because they:

state the minimum level of conduct below which no lawyer can fall without being subject to disciplinary action. Within the framework of fair trial, the Disciplinary Rules should be uniformally applied to all lawyers, regardless of the nature of their professional activities.

*Id.*

Within this framework, Canon 5 provides: "A Lawyer Should Exercise Independent Professional Judgment on Behalf of a Client." *Id.* at Canon 5. Canon 5 is implemented by, among other things, DR 5–101(B) and DR 5–102. DR 5–101, entitled "Refusing Employment When the Interests of the Lawyer May Impair His Independent Professional Judgment," provides in relevant part:

A lawyer shall not accept employment in contemplated or pending litigation if he knows or it is obvious that he or a lawyer in his firm ought to be called as a witness, except that he may undertake the employment and he or a lawyer in his firm may testify:

(1) If the testimony will relate solely to an uncontested matter or to a matter of formality and there is no reason to believe that substantial evidence will be offered in opposition to the testimony.

(2) If the testimony will relate solely to the nature and value of legal services rendered in the case by the lawyer or his firm to the client.

(3) As to any matter, if refusal would work a substantial hardship on the client because of the distinctive value

of the lawyer or his firm as counsel in the particular case.

*Id.* at DR 5–101(B). DR 5–102, entitled "Withdrawal as Counsel When the Lawyer Becomes a Witness," provides in relevant part:

If, after undertaking employment in contemplated or pending litigation, a lawyer learns or it is obvious that he or a lawyer in his firm ought to be called as a witness on behalf of his client, he shall withdraw from the conduct of the trial and his firm, if any, shall not continue representation in the trial, except that he may continue the representation and he or a lawyer in his firm may testify in the circumstances enumerated in DR 5–101(B)(1) through (3).

*Id.* at DR 5–102(A). Together, DR 5–101(B) and 5–102(A) comprise what is commonly referred to as the "witness-advocate" rule under which lawyers are prohibited from serving as an advocate and a witness in the same proceeding, except in the limited circumstances set forth in DR 5–101(B)(1)–(3). Moreover, as these DR's plainly indicate, disqualification of a lawyer is imputed to that lawyer's firm as well.

As explained in EC 5–9, "[t]he roles of an advocate and of a witness are inconsistent; the function of an advocate is to advance or argue the cause of another, while that of a witness is to state facts objectively." *Id.* at EC 5–9; *see also International Woodworkers of Am. v. Chesapeake Bay Plywood Corp.,* 659 F.2d 1259, 1273 (4th Cir. 1981). Given the potential conflicts of interest that fulfilling these two roles create, the prohibition on serving as witness and advocate is a prophylactic rule designed to protect the interests of the client, the adverse party, and the institutional integrity of the legal system as a whole. *See, e.g., MacArthur v. Bank of New York,* 524 F.Supp. 1205, 1208 (S.D.N.Y.1981) (citing *e.g.,* 6 J. Wigmore, *Evidence* § 1911 (Chadbourn rev. ed. 1976); American Bar Association Committee on Ethics and Professional Responsibility, Formal Opinion 339 (January 31, 1975) ("ABA Opinion 339")); *Supreme Beef Processors, Inc. v. American*

*Consumer Indus., Inc.,* 441 F.Supp. 1064, 1068 (N.D.Tex.1977).

The rule protects the client's interests in not having testimony on contested issues from a witness who is obviously interested in the outcome and who is subject to impeachment on that ground, and in not having an advocate who, to advance his or her client's cause, may be put in the "unseemly" position of arguing his or her own credibility. *See MacArthur,* 524 F.Supp. at 1208; 11 Va.Code Ann. Pt. 6, § II at EC 5–9; ABA Opinion 339; Samuel R. Miller and Irwin H. Warren, "Conflicts of Interest and Ethical Issues for the Inside and Outside Counsel," 40 *The Business Lawyer* No. 2 631, 663 (1984).

From the adverse party's perspective, the rule guards against the danger of a jury according undue weight to the arguments of an advocate who testified under oath. It also avoids placing the adverse party's attorney in the difficult position of cross-examining an adversary and impeaching the adversary's credibility. *See, e.g., Bottaro v. Hatton Assocs.,* 680 F.2d 895, 897 (2d Cir.1982); *MacArthur,* 524 F.Supp. at 1208.

Finally, the rule preserves the integrity of the judicial system by, among other things, eliminating any public perception that a testifying advocate has distorted the truth on the stand in order to advance his or her client's cause and prevail in the litigation. *See, e.g., Bottaro,* 680 F.2d at 897; *International Electronics Corp. v. Flanzer,* 527 F.2d 1288, 1294 (2d Cir.1975); *MacArthur,* 524 F.Supp. at 1208; *Borman v. Borman,* 378 Mass. 775, 393 N.E.2d 847, 855 (1979); 6 J. Wigmore *Evidence* § 1911 (observing that protection of the profession's image is the most potent reason for prohibiting advocates from testifying); *see also* 11 Va.Code Ann. Pt. 6, § II at Canon 9 (admonishing lawyers to avoid "even the appearance of impropriety.") Furthermore, a lawyer who is a material witness on a contested issue may be unable objectively to advise his or her client on, for example, settlement options or pre-trial stipulations, each of which contributes to the efficient administration of justice. *See*

*General Mill Supply Co. v. SCA Services, Inc.,* 697 F.2d 704, 711–12 (6th Cir.1982).

Because of the substantial interests that the witness-advocate rule is intended to protect, particularly the institutional concerns of the bar and the legal system, the witness-advocate rule embodied in DR 5–101(B) and DR 5–102(A) is mandatory, and representation in violation thereof cannot be waived by an adverse party or consented to by the client. *See, e.g., Shamblin's Ready Mix, Inc. v. Eaton Corp.,* 819 F.2d 1139 (4th Cir.1987) (unpublished disposition; text in WESTLAW); *MacArthur,* 524 F.Supp. at 1209; *Supreme Beef Processors,* 441 F.Supp. at 1068. For similar reasons, courts are empowered to raise these concerns *sua sponte* and to enforce the ethical precepts of DR 5–101(B) and DR 5–102(A) whenever the need arises. *See, e.g., SCA Services, Inc.,* 697 F.2d at 711–12; *MacArthur,* 524 F.Supp. at 1209–10.

The plain language of DR 5–101(B) and DR 5–102(A) would operate to disqualify a lawyer from serving both as advocate and witness in any case where one of the exceptions listed in DR 5–101(B)(1)–(3) did not apply, including a case where the witness-advocate was also a litigant in the case. However, several courts that have confronted the lawyer-litigant-witness scenario have concluded that when the testifying advocate is also a litigant in the case, even if represented by a member of his or her firm at trial, the witness-advocate rule does not apply. *See, e.g., In re American Cable Publications, Inc.,* 768 F.2d 1194, 1196 (10th Cir.1985); *Bottaro,* 680 F.2d at 897–98; *Harrison v. Keystone Coca–Cola Bottling Co.,* 428 F.Supp. 149, 152–53 (M.D.Pa. 1977); *Gorovitz v. Planning Bd.,* 394 Mass. 246, 475 N.E.2d 377, 379–80 (1985); *O'Neil v. Bergan,* 452 A.2d 337, 344–45 (D.C.1982); *Borman,* 393 N.E.2d at 856; *Mansur v. Drage,* 484 So.2d 618, 619 (Fla. Dist.Ct.App.), *rev. denied,* 492 So.2d 1333 (Fla.1986) (table); *Oppenheim v. Azriliant,* 89 A.D.2d 522, 452 N.Y.S.2d 211, 212 (1st Dep't 1982). *But see Omni Dev., Inc. v. Porter,* 459 F.Supp. 930, 931–32 (S.D.Fla. 1978).

Two rationales have been advanced for not applying the witness-advocate rule to the lawyer-litigant-witness. The primary rationale appears to be that the policy concerns underlying the witness-advocate rule are thought not to be implicated to a significant degree when the testifying lawyer is also a litigant, even when a member of his or her firm serves as trial counsel. *See, e.g., American Cable,* 768 F.2d at 1196; *Bottaro,* 680 F.2d at 897; *Borman,* 393 N.E.2d at 856 ("DR 5–102 regulates lawyers who would serve as counsel and witness for a party litigant. It does not address the situation in which the lawyer *is* the party litigant."). The Second Circuit observed in *Bottaro* that: "the role of the lawyer-litigant-witness is confined to testifying and his or her interest in the outcome of the litigation is clear to the trier of fact. No confusion of role or undue enhancement of advocacy results where the lawyer-witness' lack of disinterestedness is evident from his or her status as a party litigant." 680 F.2d at 897. Moreover, the unease of cross-examining opposing counsel, as distinguished from an adverse witness, also is thought to be obviated when the lawyer-witness is a litigant.

As these observations make clear, the rationale for not applying the witness-advocate rule to the lawyer-litigant-witness is premised in part on the judgment that the interests of the client and the adverse party that the witness-advocate rule are designed to protect are not imperiled when the witness-advocate is also a litigant. Similarly, because the lawyer-litigant's interest in the case is clearly demarcated (and is indeed the same as that of every other litigant in the outcome of a case), and, consequently, because the risk of apparent confusion of roles and conflicts of interest inherent in the witness-advocate context are thought to be greatly reduced, the courts that fashioned the lawyer-litigant-witness "rule" apparently have concluded that it does not substantially threaten the institutional interests in preserving the integrity of the bar and the judicial process and of promoting objective advocacy.

The second, and related, rationale for not applying the witness-advocate rule to a lawyer-litigant-witness is the view that all persons, including lawyers, have a statutory right to represent themselves or to obtain counsel to represent them in federal court. *See* 28 U.S.C. § 1654 (1988); *see also Bottaro,* 680 F.2d at 897; *Harrison,* 428 F.Supp. at 152–53; *Oppenheim,* 452 N.Y.S.2d at 212. The theory is that, at least when the policies underlying the witness-advocate rule are not implicated, lawyer-litigants should not be deprived of this right. *See Bottaro,* 680 F.2d at 897.

Although the Supreme Court of Virginia has not confronted the lawyer-litigant-witness problem, the Virginia State Bar ("VSB") has addressed the issue in several Legal Ethics Opinions ("LEO"). According to the Rules of the Supreme Court of Virginia, LEOs "have no legal effect and [are] not binding on any judicial or administrative tribunal." 11 Va.Code Ann. Part 6, § IV, para. 10(c)(vi) (Michie 1992).

In 1987, the VSB issued LEO 958 in response to the following request:

The brief and pertinent facts are that I am a law partner of and attorney for the Plaintiff in an action for breach of contract and fraud against certain defendants in the [name omitted] Circuit Court. It was at my partner's request that I represent him in this suit and it continues to be his desire that I represent him, notwithstanding opposing counsels' gestures. Neither the subject matter of the suit or the real property involved pertains to anything connected with our law partnership or legal work handled at anytime by our law firm. This is purely a private, contractual dispute between my partner and third persons totally unrelated to our practice.

In its response to this request, the VSB referred the inquiring lawyer to the Second Circuit's decision in *Bottaro,* and stated that "the rationale of the *Bottaro* Court is applicable to the provisions of the [VCPR] DR 5–101(B) and DR 5–102(A) [, n]amely that, neither of these code provisions were intended to prohibit a lawyer from representing another member of his firm in a

private action." Ultimately, the VSB published the following summary of LEO 958:

It is not improper for an attorney to represent his partner in a private contractual dispute between the attorney and third persons if neither the issues of the suit nor the real property involved pertain to anything connected with his law partnership or legal work handled by his firm.

LEO 958, August 21, 1987 (citing, *e.g.*, *Bottaro*).[1] Although LEO 958 adopted the rationale of *Bottaro*, it added the caveat that the issues in the action must not be related to the lawyer-litigant-witness' firm or to work handled by the firm.

LEO 958 was reaffirmed in LEO 1051, in which the VSB responded to an inquiry from an attorney asking whether he could represent his partner in a lawsuit, together with other parties, if the partner's testimony would be cumulative and formalistic. The partner apparently was involved in a lawsuit related to his own investment activity. In its response, the VSB stated that LEO 958 was dispositive of the inquiry. LEO 1051, March 4, 1988.

The VSB subsequently issued LEO 1315. In that matter, the VSB was asked whether a lawyer in the law firm of the administrator of an intestate decedent could represent the administrator-lawyer in defending an action seeking recovery of certain of the decedent's assets that had been placed in the hands of the attorney-administrator in his capacity as representative of the estate. The VSB responded in pertinent part as follows:

You have asked the committee to consider the propriety of an attorney representing another member of his firm who, as duly qualified administrator for the estate of a decedent, is a named defendant in a law suit which has no relation to any of the firm's former or present activities.

\* \* \* \* \* \*

If no conflict exists between the attorney/administrator and the co/administrator as to the facts, you wish to know if

representation of both named defendants by a member of the attorney/administrator's law firm is proper even if it is likely that the attorney/administrator will have to testify. You have inquired if such representation would be proper if there is a reasonable expectation that the proffered testimony will consist solely of uncontested facts relative to the transfer and status of the accounts and safety deposit box as permitted by DR 5–101(b)(1).

\* \* \* \* \* \*

The representation by an attorney of another colleague in his firm who is a potential key witness is ethically permissible provided that none of the issues in the matter in question pertain to anything connected with the law firm or legal work handled by the firm and provided that the firm member/client does not intend to perform any advocacy function with regard to the case in the future.

LEO 1315, Feb. 15, 1990 (citing *e.g.*, DR 5–101(B) & DR 5–102(A), LEO's 958 & 1051, and *Bottaro*). Like LEO 958, LEO 1315 follows the *Bottaro* rationale in allowing a lawyer-litigant-witness to be represented by a member of his or her own firm. However, LEO 1315 conditions this allowance on the issues in the action being unrelated "to anything connected with the law firm or the legal work handled by the firm" and on the litigant-lawyer not serving as an advocate in the action.

In this case, the Estate contends that the question of whether Payne's firm can represent it despite Payne's role as witness, co-executor, and member of the firm, is conclusively answered by *Bottaro* and by the VSB's adoption of the *Bottaro* rationale in LEOs 958 and 1315. According to the Estate, Payne's status as a litigant in this case makes application of the witness-advocate rule improper. The Estate's arguments are unpersuasive.

---

1. The text of published LEOs is available in Va.Code Ann. Legal Ethics and Unauthorized Practice Opinions (1991). The court obtained the unpublished portions of LEO requests and rulings from the VSB and so informed counsel during oral argument.

As discussed above, *Bottaro* holds that the witness-advocate rule does not apply to disqualify a lawyer-witness who is also a litigant in the case. According to *Bottaro*, the rationale of the rule simply does not apply to the lawyer-litigant-witness because the role of the lawyer-witness, and his or her interest in the case, are clearly defined by his or her status as a party; the lawyer-litigant has a personal stake in his or her own case that removes ambiguity as to motive or purpose in testifying. 680 F.2d at 897.

This rationale does not apply to the facts of this case. Although Payne is a named party, his status as a party is a mere formality. Payne is a party only in his representative capacity as a co-executor of the Estate. Consequently, he has no personal stake or interest in the outcome of the suit. *See Burns v. The Equitable Assocs.*, 220 Va. 1020, 1027–28, 265 S.E.2d 737 (1980). Much like Farthing, he is a paid representative of the Estate. Under these circumstances, Payne's role is closer to that of a witness-advocate than to that of a lawyer-litigant-witness. *Cf. Gorovitz*, 475 N.E.2d at 380 (suggesting that lawyer-witness whose status as a party is a mere formality, and who has no interest in the case, might not fall under the lawyer-litigant-witness rule).

Indeed, under these circumstances, concerns underlying the witness-advocate rule apply with equal force to disqualify the Estate's trial counsel. Among other things, Payne's status as a paid representative of the Estate, nominal party, and member of trial counsel's firm, creates potential confusion in the public mind regarding Payne's proper role and interest in testifying in the proceedings and therefore unnecessarily jeopardizes the integrity of the judicial process. To the lay observer, Payne may appear to be testifying on behalf of his client and in aid of his partner as in the typical witness-advocate scenario. Payne's testimony also would be subject to impeachment on this ground. Moreover, this concern about Payne's perceived status is not merely hypothetical. For example, as stated in the deposition testimony of Anita Diamant, Andrews' literary agent, both Payne *and* Farthing, as representatives of the Estate, worked on the First Writer's Contract with the ghostwriter, about which Payne is expected to testify at length.[2]

For similar reasons, the Estate's reliance on LEO 1315 is misplaced. Although implicitly endorsing—albeit improperly as discussed above—the view that the witness-advocate rule does not apply when a lawyer-witness-executor hires his or her firm to represent the estate at trial, the VSB limited the scope of this endorsement by permitting representation only when "none of the issues in the matter in question pertain to anything connected with the law firm or legal work handled by the firm." LEO 1315; *see also* LEO 958. The apparent rationale for this proviso, at least in the context of a lawyer-witness who is a party in name only, is that when a lawyer-witness-co-executor works on matters for the Estate that relate to the litigation, particularly when that work was performed with a member of his or her firm who later serves as trial counsel, the potential for confusion in the public mind of the role played by and, hence the interest of, the alleged lawyer-litigant-witness is manifest.

Here, the government contends and the court finds that issues in the case clearly relate to something connected with legal work handled by the firm. For example, Payne, apparently with Farthing's assistance, handled the First Writer's Contract with the ghostwriter. This contract, and the negotiations surrounding it, bear directly on the issues of whether Andrews' name was an asset at the time of her death and

---

**2.** Although this matter is to be tried to the court without a jury, the court finds that the VCPR's ethical mandates, particularly those founded on concerns of institutional integrity, apply equally to jury and non-jury trials. Indeed, it would be unsound to make the applicability of the witness-advocate rule turn on whether the case is a bench trial because, for example, a lawyer could be perceived as acting for his or her self-interest in waiving a jury trial simply in order to continue the representation. *See* 11 Va.Code Ann. Pt. 6, § II at Canon 9. *But see Duncan v. Poythress*, 777 F.2d 1508, 1515 n. 21 (11th Cir.1985), *cert. denied*, 475 U.S. 1129, 106 S.Ct. 1659, 90 L.Ed.2d 201 (1986).

what the value of the asset was. Although the Estate contends that this proviso applies only when the firm itself is being sued, such as in a malpractice action, the plain language of LEOs 958 and 1315, and the apparent rationale for the provision, do not admit of such a restrictive interpretation.

Accordingly, the court finds that the Estate cannot seek refuge in the safe haven for lawyer-litigant-witnesses carved out by *Bottaro* and by LEO's 958, 1051, and 1315. Accordingly, the Estate's counsel can continue to represent the Estate only if Payne's testimony falls within one of the three exceptions to the witness-advocate rule set forth in DR 5–101(B) and incorporated by reference into DR 5–102(A).

The parties do not dispute that Payne's testimony in support of the Estate's claim for attorney's fees, regarding the nature and value of the legal services performed for the Estate, is expressly permitted by DR 5–101(B)(2).

With respect to the remainder of Payne's testimony, the Estate first contends that it is permissible under DR 5–101(B)(1), which allows testimony if it "will relate solely to an uncontested matter or to a matter of mere formality and there is no reason to believe that substantial evidence will be offered in opposition to the testimony." 11 Va.Code Ann. Pt. 6, § II at DR 5–101(B)(1). According to the Estate, this exception applies primarily because no substantial evidence will be offered in opposition to Payne's testimony. This argument, however, misperceives the requirements of the exception.

As adopted by the VSB, the DR 5–101(B)(1) exception admits of two possible interpretations. The exception could be interpreted to require a two-part showing, namely, that the testimony will be on an uncontested matter or on a mere formality, *and* no substantial evidence will be offered in opposition to it. Thus, a failure of proof on the first element (uncontested matter or mere formality), ends the inquiry. The government advances this interpretation.

Alternatively, DR 5–101(B)(1) could be interpreted to comprise two distinct exceptions: first, the lawyer may testify on an uncontested matter; second, the lawyer may testify on a matter of mere formality when there is no reason to believe that substantial evidence will be offered in opposition. Under this interpretation, the "substantial evidence" requirement applies only when it is contended that the testimony will relate to a mere formality. The court finds this second interpretation to be more logical because if the matter is uncontested, the "substantial evidence" requirement becomes redundant and mere surplusage. *See* Norman J. Singer *Sutherland Statutory Construction* § 45.12 at 61 (5th ed. 1992) (indicating that interpretation of a statute that results in one part of the statute being made redundant is disfavored). This interpretation also comports with the version of DR 5–101(B)(1) adopted by the ABA Model Code of Professional Responsibility, upon which the VCPR is based. Under either interpretation, however, if the testimony does not relate to an uncontested matter or to a mere formality, it is unnecessary to consider the "substantial evidence" prong, and the exception does not apply.

Because the parties do not contend that Payne's testimony will relate to a "mere formality," DR 5–101(B)(1) applies only if, at a minimum, Payne's testimony relates to an uncontested matter. The court finds that it does not.

The principal issues in this case are whether Andrews' name and likeness had any independent value as an asset at the time of her death and, if so, what the value of that asset was. The Estate contends essentially that Andrews' name had no value at the time of her death because it was not reasonably foreseeable that post-death, ghostwritten books bearing her name would have been successful. The government disagrees, and intends to show, based on certain post-death events, such as the plan to find a ghostwriter, the negotiation of and the amounts paid under, among other things, the First Writer's contract, and the success of the ghostwritten books, that Andrews' name had value (recognized

by the Estate) and that value was reasonably foreseeable at the time of her death.

As the government points out, Payne represented the Estate as the seller of Andrews' name in various post-death transactions. Payne is expected to testify that the continued success of the V.C. Andrews' line depended on finding a suitable ghostwriter, a risky venture, and not on any independent intrinsic value of Andrews' name or likeness. The government intends to present expert testimony to the contrary and otherwise to impeach Payne's testimony. Although Payne's testimony may be corroborated in certain respects by the testimony of other witnesses, his testimony will be challenged and, consequently, his credibility put at issue. Moreover, because Payne represented the Estate in negotiating, among other things, the First and Second Writer's Contracts with the ghostwriter, Payne's testimony will bear directly on the disputed issue of the value of Andrews' name and likeness. That the parties have been unable in good faith to stipulate to issues about which Payne is to testify further underscores that Payne's testimony will relate to contested issues.

The final exception to the witness-advocate rule, contained in DR 5–101(B)(3), allows the witness-advocate to testify if refusal to do so "would work a substantial hardship on the client because of the distinctive value of the lawyer or his firm in the particular case." The Estate did not claim in its brief that this exception applied. At oral argument, however, the Estate contended that, because of the substantial expense already incurred in preparing for trial, it would suffer a substantial hardship if its trial counsel were disqualified. This argument is unavailing.

The "substantial hardship" exception to the witness-advocate rule is construed narrowly. *See, e.g., United States v. Johnston,* 690 F.2d 638, 642 n. 9 (7th Cir.1982); *Wickes v. Ward,* 706 F.Supp. 290, 293 (S.D.N.Y.1989); *United States v. Peng,* 602 F.Supp. 298, 303 (S.D.N.Y.), *aff'd,* 766 F.2d 82 (2d Cir.1985); *MacArthur,* 524 F.Supp. at 1210. It is therefore well-settled that the expense and possible delay inherent in any disqualification of counsel are insufficient to satisfy the "substantial hardship" exception to the witness-advocate rule. *See, e.g., United States v. Peng,* 766 F.2d 82, 87 (2d Cir.1985); *Universal Athletic Sales Co. v. American Gym, Recreational & Athletic Equip. Corp.,* 546 F.2d 530, 538 n. 21 (3d Cir.1976), *cert. denied,* 430 U.S. 984, 97 S.Ct. 1681, 52 L.Ed.2d 378 (1977); *Wickes,* 706 F.Supp. at 293; *Federal Deposit Ins. Corp. v. Sierra Resources, Inc.,* 682 F.Supp. 1167, 1171 (D.Colo.1987); *Kalmanovitz v. G. Heileman Brewing Co.,* 610 F.Supp. 1319, 1326 (D.Del.1985); *May's Family Centers Inc. v. Goodman's Inc.,* 590 F.Supp. 1163, 1165 (N.D.Ill.1984); *Teleprompter of Erie, Inc. v. City of Erie,* 573 F.Supp. 963, 966 (W.D.Pa.1983); *MacArthur,* 524 F.Supp. at 1210. As several courts have observed, were this not so, the exception would swallow the rule. *See, e.g., Peng,* 766 F.2d at 87; *Kalmanovitz,* 610 F.Supp. at 1326; *MacArthur,* 524 F.Supp. at 1210.

Nor has it been demonstrated that trial counsel's firm has a distinctive value to the Estate as a result of any long-standing relationship with the Estate and familiarity with its affairs such that substitution of counsel would be prejudicial. *See, e.g., MacArthur,* 524 F.Supp. at 1211. Indeed, at oral argument, the Estate's trial counsel candidly conceded that, with reasonable time for preparation, any qualified trial lawyer could represent the Estate in this case. The court therefore finds that the "substantial hardship" exception does not apply.

## CONCLUSION

Based on the foregoing, the court concludes that the Estate's trial counsel is disqualified from further representation of the Estate in this action. The court does not suggest that counsel intentionally engaged in unethical conduct. Counsel acted in good faith and believed, albeit erroneously as it turns out, that representation of the Estate was proper. Nevertheless, the ethical requirements of DR 5–101(B) and DR 5–102(A) are mandatory. Because Payne

**830**

will be a key witness at trial, his firm must withdraw as trial counsel.

The trial of the case will be continued to allow the Estate an adequate opportunity to select replacement counsel. The court will meet with current counsel for both parties and replacement counsel for the Estate on November 3, 1992, at 9:00 a.m., to set a new trial date.

The Clerk is directed to send a copy of this Memorandum Opinion and Order to all counsel of record.

It is so ORDERED.