**PERSONALIZED MASS MEDIA CORP., Plaintiff,**

**The WEATHER CHANNEL, INC., et al., Defendants.**

**Civ. A. No. 2:95cv242.**

United States District Court, E.D. Virginia, Norfolk Division.

Sept. 8, 1995.

240

Harris D. Butler, III, Charles L. Williams, William J. Pantele, Butler, Macon, Williams, Pantele & Lowndes, P.C., Richmond, Virginia, Andrew R. Shoemaker, Howrey & Simon, Washington, DC, for plaintiff.

Conrad M. Shumadine, Walter D. Kelley, Jr., Willcox & Savage, Norfolk, Virginia, A. Stephens Clay, William H. Boice, John S. Pratt, James L. Ewing, IV, Dean W. Russell, Craig R. Kaufman, Caroline W. Spangenberg, Kilpatrick & Cody, Atlanta, Georgia, for defendants.

## MEMORANDUM OPINION AND ORDER

PAYNE, District Judge.

This matter is before the court on the motion of the defendant, The Weather Channel, Inc., Inc. ("TWC") to disqualify Thomas J. Scott, Jr. and Howrey & Simon, the law firm in which Scott is a partner, from serving as trial counsel to the plaintiff, Personalized Mass Media Corp. ("PMMC"). For the reasons set forth below, the motion to disqualify is granted.

## STATEMENT OF FACTS

PMMC instituted this action against TWC and several other defendants alleging the infringement of three patents of which PMMC is the assignee. The patents in suit are the '825 Patent issued on October 23, 1990, the '414 Patent issued on April 28, 1992 and the '277 Patent issued on August 2, 1994.[1] It is alleged that each of the patents in suit relates back to and derives support from a patent applied for in 1981.

The history of the patents in suit began in the late 1970s when John C. Harvey, president and principal shareholder of PMMC became interested in patenting certain ideas relating to technology of the sort here at issue. Harvey filed U.S. Patent Application No. 317,510 (the " '510 Application") on November 3, 1981. In February 1986, PMMC filed U.S. Patent Application No. 829,531 (the " '531 Application") which was a continuation of the '510 Application. In September 1987, PMMC filed U.S. Patent Application No. 96,-096 (the " '096 Application") which is alleged to be a continuation-in-part application claiming priority relating back to the '510 Application but adding new matter. The '096 Application was issued as the '825 Patent in October 1990. On September 25, 1990, PMMC filed U.S. Patent Application No. 588,126 (the " '126 Application"), alleged to be a continuation of the '096 Application. The '126 Application was issued as the '414 Patent in April 1992. On March 10, 1992, PMMC filed U.S. Patent Application No. 849,226 (the " '226 Application"), alleged to be a continuation of the '126 Application. On May 3, 1993, PMMC filed U.S. Patent Application No. 56,-501 (the " '501 Application"), alleged to be a continuation of the '226 Application. The '501 Application issued as the '277 Patent in August 1994.

The patents in suit are alleged to control technology relating to the insertion of locally generated television images into a national television broadcast to present a national program with segments that are tailored to local viewing areas. TWC provides to cable television operators programming that includes weather forecast information, control signals and other information which the cable operator transmits to its cable subscribers. This programming requires the use of a receiver known as "Weather Star 4000" which is made, used, sold or leased by TWC to its cable operator customers.

---

1. The full descriptions of the respective patents are U.S. Patent No. 4,965,825; U.S. Patent No. 5,109,414; and U.S. Patent No. 5,335,277, respectively.

The complaint alleges that TWC infringes the '825 Patent, the '414 Patent and the '277 Patent "[b]y providing the TWC programming, information and control signals and by making, using and selling the infringing Weather Star 4000 receiver." (Complaint, ¶ 26). PMMC also alleges that, in so doing, TWC induces others to infringe each of the patents in suit.

TWC and the other defendants deny that they infringe PMMC's patents. Also, they assert, as affirmative defenses, that PMMC is in laches in the general equitable sense of that term and that PMMC is barred by the doctrine of laches as it is applied in patent jurisprudence. As an additional affirmative defense, TWC alleges that PMMC, alone and with Scott's assistance, has engaged in inequitable conduct which renders the patents in suit unenforceable. It is Scott's role in the prosecution of the '510 Application, the continuation applications and the patents in suit, in addition to his involvement in the business plan and strategy for enforcing PMMC's patent rights, that form the basis of TWC's motion to disqualify Scott and Howrey & Simon.

The defense of laches raised by TWC is essentially that PMMC deliberately delayed presenting to the U.S. Patent and Trademark Office ("PTO") claims to long-known inventions so that PMMC could await the distribution of products and systems in the marketplace and then draft claims covering those products and systems. At deposition, Scott testified that each and every invention claimed in the PMMC patents since 1981 was known to Harvey at the time the '510 Application was filed in 1981. The record shows that there were lengthy delays in prosecuting the continuation applications and the patents in suit. TWC contends that documents, including PMMC's business plans and correspondence with outsiders, show that the purpose of these delays was a strategic one based on PMMC's anticipation that others would develop commercially valuable technologies which PMMC could appropriate by grafting subsequent patent claims and referencing them back to the '510 Application for priority purposes. According to TWC, this conduct invokes the bar of laches to preclude enforcement of the patents in suit. Scott's deposition and the documentary evidence used as exhibits to his deposition disclose that evidence exists to support that theory.

TWC's affirmative defense of inequitable conduct is premised principally upon the failure of PMMC and Scott to disclose prior art research and references to the PTO. On those questions, the record shows that Scott assisted Harvey and a co-inventor in developing the '510 Application and in formulating the disclosures which TWC contends to be inadequate because of the alleged failure to disclose prior art. Scott was involved in this process while employed as a lawyer with the firm of Cooper, Dunham, Clark, Griffin & Moran, during the period between the summer of 1979 and the spring of 1980. Scott left private practice to join the Justice Department as a patent attorney in May of 1980. Thereafter, it appears that Scott continued to assist Harvey in preparing the '510 Application but did not receive compensation for doing so. Instead, Scott apparently acted as a friend of Harvey's, rather than as counsel.

After Scott joined the Justice Department in 1980, Harvey retained the law firm of Darby & Darby to assist in preparing and filing the '510 Application. However, after Scott left the Justice Department in July of 1985, Harvey retained him to prosecute the applications for the patents in suit which, as explained above, are alleged to relate back to the '510 Application filed in 1981.

The evidence adduced to date raises an issue whether certain prior art, domestic and foreign, ought to have been disclosed by PMMC and Scott in connection with the '510 Application and the continuation applications which are the bases for the patents in suit. Also, there is evidence that Scott has knowledge of, and a role in, the decisions respecting the disclosures to the PTO respecting foreign and domestic prior art. In fact, in literature prepared by PMMC for use in raising capital describes Scott's role as follows:

**PATENT COUNSEL**

Thomas J. Scott, a partner in the firm of Howrey & Simon is PMMC's patent counsel. *He has advised John Harvey about*

*the filing and prosecuting of the Company's patent position since the late 1970's. He is the expert on all aspects of the Company's patent position: including the disclosures on file in the U.S. Patent and Trademark Office, the disclosures associated with the Company's patent applications in Europe, Japan and elsewhere and the Company's development of its future patent prosecution strategy. He joined his current firm in mid–1990.*

*Prior to that time he was a partner in the firm of Pennie & Edmonds and earlier senior patent litigator for the U.S. Department of Justice.*

(emphasis added). This description of Scott's involvement in the prosecution of the patents at issue is not disproved by Scott's testimony at the deposition he gave in connection with the motion for disqualification or by the deposition exhibits.

Against this general background, it is appropriate to consider the controlling legal principles and the arguments of the parties respecting how those principles apply here.

## DISCUSSION

Under Local Rule 7(I), the Virginia Code of Professional Responsibility ("VCPR") sets "[t]he ethical standards relating to the practice of law in this court." The VCPR consists of Canons, Disciplinary Rules ("DRs") and Ethical Considerations ("ECs"). Canons are axiomatic norms articulating general standards of professional conduct. ECs are aspirational statements of objectives for the profession. DRs are mandatory statements of the minimum level of conduct below which no lawyer can fall without being subject to discipline. *Estate of Andrews v. United States,* 804 F.Supp. 820, 823 (E.D.Va.1992).

This motion turns on Canon 5 which provides that "A Lawyer Should Exercise Independent Professional Judgment on Behalf of a Client." Canon 5 is implemented by DR 5–102 which is entitled "Withdrawal as Counsel When the Lawyer Becomes a Witness." DR 5–102(A) applies when, "after undertaking employment in contemplated or pending litigation, a lawyer learns or it is obvious that he or a lawyer in his firm ought to be called as a witness on behalf of his client. . . ." In

that situation, the lawyer and the firm are obligated to withdraw from representation except under the three exceptional circumstances articulated in DR 5–101(B).

The motion in this action, however, is based on DR 5–102(B) which applies where "after undertaking employment in contemplated or pending litigation, a lawyer learns or it is obvious that he or a lawyer in his firm *may be called as a witness other than on behalf of his client* . . . ." DR 5–102(B) (emphasis added). In that instance, the lawyer "may *continue* the representation *until* it is *apparent* that his *testimony is or may be prejudicial to his client.*" DR 5–102(B) (emphasis added).

Taken together, DR 5–101(B) and DR 5–102(A) and (B) comprise the "witness-advocate" rule which prohibits lawyers from serving as an advocate and a witness in the same proceeding except as explicitly permitted by the exceptions in DR 5–101(B)(1)–(3), where that subsection is applicable. The same prohibition governs disqualification of the lawyer's firm. *Estate of Andrews,* 804 F.Supp. at 823. The rule derives from the fundamental fact that the roles of advocate and witness are inconsistent, it being the function of the advocate to argue the cause of another and the role of a witness to state facts objectively. *Id.* In recognition of this fundamental difference in the roles of witness and advocate, the rule serves as a "prophylactic rule designed to protect the interests of the client, the adverse party, and the institutional integrity of the legal system as a whole." *Id.* (citations omitted).

Of course, these ethical rules and the disqualification which results from their application must be considered in perspective of the fundamental principle that a party ought to be represented by its counsel of choice if that is at all possible. Moreover, motions for disqualification under DR 5–102(B), predicated as they are upon the premise that the opposing party will call counsel for an adversary as a witness, are subject to abuse. And, there is a real risk that disqualification will be sought for tactical advantage only and not because of the ethical considerations on which the witness-advocate rule is based.

*See, e.g., Shaffer v. Farm Fresh,* 966 F.2d 142, 146 (4th Cir.), *cert. denied,* —— U.S. ——, 113 S.Ct. 657, 121 L.Ed.2d 583 (1992).

■ Therefore, disqualification under DR 5–102(B) must be accompanied by a showing that the testimony of the lawyer is (1) relevant; (2) necessary; and (3) is or may be prejudicial to the client whose lawyer is to be called as a witness by the adverse party. Legal Ethics Opinion No. 1394, February 15, 1991, citing *Cottonwood Estates v. Paradise Builders,* 128 Ariz. 99, 624 P.2d 296, 302 (1981). The moving party bears the substantial burden of demonstrating specifically how and as to what issues in the action the prejudice exists or is likely to occur. *Lamborn v. Dittmer,* 873 F.2d 522, 531 (2d Cir.1989); *Summagraphics Corp. v. Sanders Assocs., Inc.,* 19 U.S.P.Q.2d (BNA) 1859, 1861, 1991 WL 322234 (D.Conn.1991); *Tessier v. Plastic Surgery Specialists, Inc.,* 731 F.Supp. 724, 729 (E.D.Va.1990); *Clinton Mills, Inc. v. Alexander & Alexander, Inc.,* 687 F.Supp. 226 (D.S.C.1988); *Freeman v. Kulicke & Soffa Indus., Inc.,* 449 F.Supp. 974, 978 (E.D.Pa. 1978), *aff'd,* 591 F.2d 1334 (3d Cir.1979); *Rice v. Baron,* 456 F.Supp. 1361, 1371 (S.D.N.Y. 1978).

■ First, the record here establishes that Scott's testimony clearly is relevant within the meaning of Fed.R.Evid. 401. PMMC does not really contend otherwise.

Second, the record establishes the necessity of Scott's testimony. PMMC argues that Scott's testimony is not necessary because Harvey can testify to the same topics which would be addressed by Scott. This argument misses the mark. Scott's testimony is essential to many of the inequitable conduct issues. He is the one who allegedly failed to submit much of the relevant prior art. Harvey is not privy to Scott's unique knowledge about the reasons for his failure to submit the prior art. Further, Scott alone knows why he considered adequate the disclosures on which he advised Harvey, either as friend or as counsel. TWC is entitled to this information from Scott to help present its inequitable conduct defense.

It is not a sufficient answer, as PMMC contends, that Scott cannot now recall much

about the matters as to which he is expected to testify. With further study of the documents and interviews by other counsel, Scott may, as the litigation progresses, recall more about the topics to which his testimony is expected to be addressed. In any event, many of the evidentiary points which TWC intends to elicit through Scott's testimony are referred to in documents authored by, or sent to, Scott as the patent expert described by PMMC. He reasonably should be expected to have knowledge about those documents and the topics they discuss. TWC is entitled to probe Scott's recollection on the basis of those documents either to see if that probing refreshes his recollection or to establish whether a document constitutes Scott's past recollection recorded. None of that may be done through Harvey. The court therefore has no difficulty in concluding that Scott's testimony is necessary to TWC's inequitable conduct defense.

PMMC's own literature also describes Scott as the expert on its patent strategy as well as its disclosures. This alone is sufficient to make his testimony necessary on the affirmative defense of laches.

■ Third, TWC has made the requisite showing on the prejudice factor. PMMC argues that TWC has failed to establish the prejudice prong of the test for disqualification because Scott's testimony to date has not been prejudicial in fact. This argument is premised on a misreading of the prejudice requirement. By its clear terms DR 5–102(B) requires a showing that the testimony "is or may be prejudicial" to the client. Whether testimony may be prejudicial is to be determined against an objective standard and, of course, may not be satisfied by mere speculation as to its effect. *Shaffer,* 966 F.2d at 146.

Based upon Scott's deposition and the documents produced to date, it is clear that Scott's testimony on the affirmative defense of laches could be construed by a jury as prejudicial to PMMC. For example, Scott has testified that each and every invention claimed by PMMC since 1981 was known to Harvey at the time the '510 Application was filed. Further, as a person knowledgeable about PMMC's business strategy, Scott rea-

sonably can be expected to know the reasons for the delays in presenting those claims in the continuation patents. Where, as here, there is evidence that the delay was deliberate, Scott's testimony could prove prejudicial to PMMC because it would offer support for TWC's position on the issue of laches.

In like fashion, Scott's testimony could be prejudicial to PMMC on the critical question of inequitable conduct. By PMMC's own admission, Scott has been involved in its patent prosecution and strategy for many years, perhaps as far back as the 1970s. According to PMMC, he is the most knowledgeable person about the disclosures on file in the PTO, the disclosures associated with the foreign patents, and the disclosures accompanying the 300 pending applications for related patents. Scott also is described by PMMC as "the expert on all aspects of the Company's patent position: including ... the Company's development of its future patent prosecution strategy."

There is evidence that Scott had available to him information about prior art which was not timely filed in connection with the '825 Application. If the jury were to believe that material was deliberately withheld, it would be prejudicial to PMMC because proof of such inequitable conduct would render PMMC's patents unenforceable. There is also evidence from which a jury might conclude that pertinent foreign art was likewise not disclosed and that Scott was knowledgeable about the reasons for the nondisclosure. If that withholding was deliberate and it involved material references, the prejudice to PMMC is obvious. Evidence offered to date permits the conclusion that those issues will be litigated at trial and that Scott possesses potentially prejudicial information pertinent to their resolution. There is also potential prejudice in Scott's testimony respecting the decisions not to disclose post–1981 art in connection with later applications. The same may be said about the reasons why the Hazelwood [2] and Greenberg [3] patents were not cited or disclosed as relevant prior art in the original '510 Application made in 1981.

In sum, the record here establishes that some of Scott's testimony already *is* prejudicial to PMMC and other testimony reasonably *may be* characterized in that fashion without indulging in speculation or surmise. This is all that DR 5–102(B) requires and, under the circumstances, the court is confident that an appropriate showing of prejudice has been made.

■ Even if a lawyer's testimony were proved relevant, necessary, and prejudicial, DR 5–102(A) provides for three limited exceptions under which a lawyer may testify as a witness on behalf of his client and still continue representation of that client. The first exception permits the lawyer to testify about an uncontested matter or a matter of formality as to which no substantial evidence will be offered in opposition. DR 5–101(B)(1); *Estate of Andrews,* 804 F.Supp. at 828. The second exception permits the lawyer to testify about the nature and value of legal services rendered by the lawyer or the firm. DR 5–101(B)(2). The third exception provides that the lawyer may testify:

> [a]s to any matter, if refusal would work a substantial hardship on the client because of the distinctive value of the lawyer or his firm as counsel in the particular case.

DR 5–101(B)(3). PMMC argues that disqualification would present a substantial hardship to it and that, therefore, Scott should be permitted to testify and disqualification should be denied under this exception.

All three exceptions appear in the first instance in the rules respecting accepting employment knowing that testimony will be required on behalf of the client in DR 5–101(B), but all three exceptions are incorporated specifically by reference in DR 5–102(A). The law is less than clear whether the three exceptions enumerated in DR 5–101(B), and incorporated specifically in DR 5–102(A), are applicable when disqualification is sought under DR 5–102(B). Unlike DR 5–102(A), the three exceptions permitted by DR 5–101(B)(1)–(3) for testimony on behalf of the client are not specifically mentioned in the rule governing when the lawyer will be a witness other than on behalf of his client and

2. U.S. Patent No. 4,025,851.

3. U.S. Patent No. 4,547,804.

it appears that the testimony may be prejudicial to the client. *Compare* DR 5–102(B) *with* DR 5–102(A).

Thus, a strict reading of DR 5–102(B) militates against a construction that the substantial hardship exception, DR 5–102(B)(3), is available when a lawyer is called by the opposing party and his testimony is or may be prejudicial to his client. Moreover, none of the cases cited by PMMC support its assertion that the substantial hardship exception applies. For example, *Optyl Eyewear Fashion Int'l v. Style Cos.* did not incorporate the substantial hardship exception into DR 5–102(B). Rather, the exception was only mentioned in connection with DR 5–101(B) and DR 5–102(A). 760 F.2d 1045 (9th Cir.1985). Likewise, *Clinton Mills* briefly mentions the exception in connection with DR 5–102(A) but not at all in its discussion of DR 5–102(B). 687 F.Supp. at 229. Finally, in *Summagraphics*, although the court did note that the hardship to the plaintiff of retaining substitute counsel was lessened because it was aware of the possibility of disqualification from the outset of the litigation, it never suggested that "substantial hardship" was an exception under DR 5–102(B). 19 U.S.P.Q.2d at 1862, 1991 WL 322234 at *3.

It is, however, unnecessary to decide that question in this action because, even if the substantial hardship exception applies, PMMC has not met it. From the outset, PMMC knew of the possibility of disqualification. Scott's testimony and PMMC's own literature make clear the extent of Scott's involvement in the applications and patents here at issue, in PMMC's patent strategy and in the events and circumstances on which TWC predicates its defenses of laches and inequitable conduct. Armed with that knowledge, PMMC, Scott and Howrey & Simon reasonably could have expected a challenge to the participation of Scott and the law firm in any litigation alleging infringement of PMMC's patents. *See, e.g., Summagraphics,* 19 U.S.P.Q.2d at 1862, 1991 WL 322234 at *3. Thus, PMMC cannot be heard to claim hardship now that the prospect has matured to reality.

Moreover, PMMC has incurred no legal fees in connection with the prosecution of the action to date because the law firm has agreed to undertake this representation of PMMC on a contingency basis. As such, the concerns about undue expense to which PMMC's brief alludes do not contribute in fact to any hardship on PMMC.

Furthermore, before the exception applies, the hardship must "be specifically related to the distinctive value of the lawyer as counsel in the particular case." Legal Ethics Opinion No. 1386, January 14, 1991. The record here contains nothing from which the court could conclude that the services of Scott or Howrey & Simon are distinctive within the meaning of the substantial hardship exception of DR 5–101(B)(3). To the contrary, there are a considerable number of law firms fully capable of undertaking the representation of PMMC in this action. Those lawyers will be able to consult with Scott and Howrey & Simon and the other lawyers who have been involved in the prosecution of PMMC's patents. Thus, the time and money invested by PMMC in Scott and Howrey & Simon in connection with prosecution of the patents and planning of the patent strategy will not be lost to PMMC. Accordingly, disqualification of Scott and Howrey & Simon could not be avoided under the substantial hardship exception, even if it did apply under DR 5–102(B).

For the foregoing reasons, it is apparent that Scott and his law firm, Howrey & Simon, ought to be disqualified and the motion seeking disqualification is granted.

The Clerk is directed to send a copy of this Memorandum Opinion and Order to all counsel of record.

It is so ORDERED.